## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NO. 23-cr-63 (RDM) |
| v. | : | |
| | : | |
| ENIS JEVRIC, | : | |
| | : | |
| Defendant. | : | |

### UNITED STATES' SENTENCING MEMORANDUM

The Defendant, Enis Jevric, was an on-duty Metropolitan Police Department (MPD) sergeant when he shot and killed An'Twan Gilmore without any lawful justification. For this egregious conduct, the Defendant pleaded guilty to two serious crimes, admitting responsibility for using unconstitutional force and committing involuntary manslaughter. For the reasons detailed below, the Defendant should be sentenced to 84-months imprisonment. Such a guideline sentence is necessary to acknowledge the grievous nature of the offense, afford adequate deterrence, promote respect for the rule of law, and avoid unwarranted sentencing disparities.

### I.     FACTUAL BACKGROUND

#### a.  The Fatal Shooting

The Defendant's fatal shooting of An'Twan Gilmore occurred in the early morning hours of August 25, 2021. The incident began around 2:45 a.m., when MPD patrol officers found a man (identified after the shooting as Gilmore) asleep in the driver's seat of a car that was stopped at a traffic light at the intersection of New York and Florida Avenues in Northeast Washington, D.C. No one else was inside the car. The officers determined that the car was not stolen; it was validly registered to a female owner in Maryland.

As they approached the vehicle, officers could not tell whether the car was in gear or parked, although its rear brake lights were illuminated. The car's windows were up and its doors

were locked.  Officers shined a flashlight into the vehicle and saw that the driver had a handgun in

his waistband.  But because the officers did not have any identifying information about the driver,

they could not determine whether he lawfully possessed the firearm.

As the driver remained asleep in the car, on-scene officers called for backup.  As more

MPD units arrived, officers cleared the avenues in front of the car of pedestrian and vehicle traffic.

After officers had been on-scene for about ten minutes, they requested the presence of an officer

with a ballistics shield.  At no point during this process did the driver wake or the car move.

The Defendant, who was working in the Fifth District, arrived with a ballistics shield.  He

approached the group of officers and the car at around 3:06 a.m.  By the time he arrived, there

were eighteen officers on scene, with no fewer than eleven officers near the car.

Video from an overhead traffic camera captured much of the incident.[1]  The below

screenshot from that video depicts the scene when the Defendant arrived with a ballistics shield

and approached the driver's side door.  As seen in the image, the avenues had been closed off to

whatever minimal traffic might otherwise have been there at this time of night.

---

[1] The FBI took the footage from this traffic camera and overlaid the audio from the Defendant's body-
worn camera footage onto it.  A copy of the resulting video is being provided with this Memorandum as
Exhibit 1.



Standing mere feet from the driver's window, the Defendant pointed his gun at the still-sleeping driver, ordered other officers to illuminate the driver's seat area with their flashlights so that he could see into the car, and directed one officer to knock on the car's windows.

As was to be expected and presumably intended, the knocking roused the driver. Gilmore sat up, appearing disoriented.

The Defendant's body-worn camera (BWC) was activated at the time.[2] The below screenshot from the Defendant's BWC shows the moment Gilmore awoke and the confused look on Gilmore's face:

---

[2] A copy of the Defendant's BWC footage is being provided with this Memorandum as Exhibit 2.



After Gilmore woke up, the car he was in rolled forward several feet and stopped.  Footage from on-scene officers' BWC shows both of Gilmore's hands appearing on the steering wheel.  On the BWC, officers are heard briefly stating "don't move," and the Defendant states, "watch the hands."   In an almost incalculably short amount of time after the Defendant said, "watch the hands," the car inched forward, at which point the Defendant fired four times into the car.  No other officer fired.

After the first volley of shots, the car rolled forward without acceleration.  The Defendant then fired six more shots at the car as it rolled down the closed-off avenue.

The below screenshot from the traffic camera shows the Defendant leaning forward and shooting at the rolling car, as every other officer disengages.



Ultimately, ten shots were fired—all by the Defendant.  When the shooting stopped, the Defendant and other officers followed the car on foot before some officers were able to get in their police cruisers to catch up to the car faster.  The Defendant's BWC captured him occasionally cursing to himself as he followed on foot.

The car continued to roll forward until it came to rest against a tree.  The Defendant arrived at the car as a group of officers were working on getting Gilmore out of the vehicle.  The Defendant joined the effort.  When officers entered the car to get Gilmore out, he was bleeding, unresponsive, and unconscious.  The gun that officers had observed before the shooting when they first responded to the scene was still in the same spot, tucked into Gilmore's waistband, underneath his buckled seat belt.

Officers attempted life-saving measures and an ambulance transported Gilmore to the hospital, but he was pronounced dead from gunshot wounds a short time later.

### b.  The Federal Investigation

The Federal Bureau of Investigation (FBI) quickly initiated a federal criminal civil rights investigation into the shooting.  Among other things, the investigative team obtained a large

amount of relevant video footage (from various officers' BWC and the traffic camera noted above), forensic reports and analyses (such as the autopsy), and witness testimony from both eyewitnesses and relevant experts.

The facts established through the investigation support the Defendant's guilty plea and demonstrate that he committed a federal civil rights violation and involuntary manslaughter.

### i. Eyewitnesses

As part of his plea agreement, the Defendant admitted to using objectively unreasonable force and grossly deviating from a reasonable standard of care. *See* ECF No. 22 at para. 8. The conduct of and statements from other on-scene officers support that admission.

Multiple on-scene officers informed the government that it was not rare for Fifth District officers to get calls for an individual asleep in a car. They further explained that such drivers often drive away when awakened by law enforcement—something they expected might happen in this case, which is why they cleared the avenue in front of the car Gilmore was in.

Based on their respective vantage points, no on-scene officer interviewed by the government saw a basis to shoot Gilmore. This included officers who had a direct line of sight to see Gilmore in the moments leading up to the Defendant's use of deadly force. Several described being "shocked" that shots were fired.

### ii. Training, Policies, and Procedures Evidence

Through his plea agreement, the Defendant also admitted that he acted willfully and in reckless disregard of Gilmore's constitutional rights. *See* ECF No. 22 at para. 8. Evidence attained during the federal investigation corroborates this admission.

The investigative team obtained information concerning MPD use of force policies and training, and the degree to which the Defendant's conduct in this case deviated from the relevant standards that were the subject of specific training he received.[3]

MPD requires every officer to complete use of force training twice a year. Among other things, the training covers relevant MPD policies and the constitutional legal requirements for using force (including deadly force). It also includes a hands-on practical test at the gun range for shooting accuracy. The Defendant was up to date on this training at the time of the shooting—in fact, he completed his yearly requirements for 2021 just over three weeks before he killed Gilmore.

The investigative team also consulted with a veteran MPD use of force trainer, who explained that this shooting was inconsistent with MPD use of force policies and officer training.[4] MPD policy permits officers to use deadly force only when it is necessary to defend themselves or another person from an imminent actual or threatened attack that could result in death or serious bodily injury. In line with this policy, all MPD officers are trained that if they use deadly force by firing their guns, they are responsible for every discharged round—meaning that officers must be able to articulate an appropriate basis for using deadly force for every shot fired. An officer cannot merely assume there is a threat to justify a use of force; instead, the officer must actually perceive a threat of deadly or serious bodily injury in order to use lethal force. MPD officers are also trained that they cannot shoot at a vehicle merely because it is fleeing.[5]

---

[3] A copy of the MPD Use of Force Policy in place at the time of the crime is being provided with this Memorandum as Exhibit 3.

[4] Testimony from the trainer is being provided separately under seal as Under Seal Exhibit A.

[5] The policy permits officers to use deadly force to stop a feeling felon under limited circumstances involving an imminent risk of death or serious bodily harm. But that principle did not and does not apply here, as the on-scene officers had no reason to believe Gilmore was a fleeing felon.

This MPD use of force trainer reviewed videos of this shooting to assess whether it was consistent with the relevant MPD standards. The trainer saw no basis for the first volley of four shots. Upon reviewing video footage, in the trainer's view there was no imminent threat as both of Gilmore's hands appeared to be gripping the steering wheel. A screenshot of a sample video demonstrating this is provided below, with Gilmore's hands identified with the red arrows:[6]



The trainer also explained that, because an officer cannot rely on assumptions and must perceive a threat before acting, an officer cannot shoot a person known to have a gun just because the officer is not sure where the person's hands are located.

The trainer also saw no justification for the second volley of six shots because there was no immediate threat to anyone as the car rolled slowly down New York Avenue.

---

[6] This snapshot comes from a slowed-down excerpt of the BWC footage of an officer who was standing next to the Defendant at the time of the shooting. That video excerpt is being provided with this Memorandum as Exhibit 4.

### iii.  Autopsy Results

The D.C. Office of the Chief Medical Examiner (OCME) performed an autopsy on Gilmore.  The autopsy concluded that Gilmore was struck by three gunshots: one in the left upper back; one in the left mid-back; and a graze wound to the lower lip.  The examination determined that either of the two shots that entered Gilmore's back would have been independently fatal, given their path through his body and the damage they caused to his essential organs.  Based on the volume of internal blood loss within Gilmore's body cavity at the time of his death, the doctor who performed the autopsy further concluded that Gilmore was still alive at the time each independently fatal shot hit him.[7]

### iv.  Trajectory Analysis

FBI specialists conducted a trajectory analysis of the shooting.  The analysis identified a bullet trajectory that passed through the rear driver's side door and led to the left side of the driver's seat, in a location consistent with one of the fatal shots to Gilmore's back.  That trajectory is shown with the pink rod marked "T1" in the photos below:[8]

---

[7] The OCME autopsy is being provided separately under seal as Under Seal Exhibit B, and the FBI summary of an interview with OCME doctors is being provided as Under Seal Exhibit C.

[8] Incident reconstruction trajectory numbers do not relate to the actual order of shots fired.





Available evidence demonstrates that trajectory "T1" is from a bullet fired during the second volley. Officer BWC shows that all four shots from the first volley struck the car's windows. The bullet from the "T1" trajectory struck the car at an acute angle, indicating that the

shooter was positioned behind the vehicle rather than next to it.  That is consistent with video footage depicting the Defendant shooting at the car as it rolled slowly down New York Avenue.

## II.     RELEVANT PROCEDURAL BACKGROUND

On March 2, 2023, a grand jury indicted the Defendant on three charges arising from the fatal shooting: one count of deprivation of rights under color of law resulting in death, in violation of 18 U.S.C. § 242; one count of using a firearm to commit murder, in violation of 18 U.S.C. §§ 924(c) and (j); and one count of second degree murder, in violation of D.C. Code § 22-2103.

On February 23, 2024, the Defendant pled guilty to a two-count criminal Information charging him with: one count of deprivation of rights under color of law resulting in death, in violation of 18 U.S.C. § 242; and one count of involuntary manslaughter, in violation of D.C. Code § 22-2105.

Sentencing was initially scheduled for July 1, 2024.  A defense-requested continuance was granted, and sentencing is currently scheduled for August 15, 2024.

## III.     APPLICABLE LAW & PRINCIPLES

When a defendant is facing sentencing in federal court for both federal and D.C. Code violations—as the Defendant is here—the Court uses the D.C. Voluntary Sentencing Guidelines to determine a guideline range for the D.C. Code offenses and the U.S. Sentencing Guidelines to calculate a guideline range for the federal crimes.  *See United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016) (holding that "the federal Sentencing Guidelines do not apply to the sentencing of D.C. offenses. . . .  Likewise, the D.C. Voluntary Sentencing Guidelines do not apply to the sentencing of federal offenses").  Once these respective guidelines are properly calculated, "how a court is to relate a [federal] Guidelines sentence to a non-[federal] Guidelines sentence is a matter of discretion."  *Id.*

For the federal § 242 violation, the Court will first determine the applicable federal advisory guideline range for the offense.  *See United Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Because that guideline range is meant to "secure nationwide consistency" and is "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing determinations," that range should serve as an "initial benchmark" for the sentence.  *Id.* at 47-50.

After determining the guideline range, the Court must consider the various factors set forth in 18 U.S.C. § 3553(a).  The factors include: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense and promote respect for the law; the need for the sentence to afford adequate deterrence; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  *See generally* 18 U.S.C. § 3553(a).

A similar process drives determination of the sentence for the D.C. code offense.  For that violation, the court begins by referencing the D.C. Voluntary Sentencing Guidelines.  Though entirely voluntary, the D.C. Sentencing Commission anticipates that most defendants will receive a guideline sentence.  This is because, like the federal guidelines, the D.C. guidelines are formed with the "bedrock principle" that "like offenses/defendants should be sentenced alike."  *See* District of Columbia Sentencing Guidelines Manual at § 5.2.1 (2023).  And though the D.C. guidelines are voluntary, a judge departing from the applicable guideline range must state the reasons for the departure on the record and communicate the reason for any departure to the D.C. Sentencing Commission.  *Id*.

Just as federal law (*i.e.*, § 3553) mandates certain factors that the Court must consider when determining the sentence for the federal offense, local law includes a set of factors that must be

considered when determining the sentence for the D.C. Code offense.  *See* D.C. Code § 24-403.01(a).  Those D.C. statutory factors mirror the U.S. Code factors and include: the seriousness of the offense and the criminal history of the offender; the need to provide just punishment and afford adequate deterrence; and providing the offender with needed educational or vocational training, medical care, and other correctional treatment.  *Id*.

In determining a sentence, the Court may consider all factual evidence relevant to the conduct of conviction that is proven by a preponderance of the evidence.  *See United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015); *see also Powers v. United States*, 588 A.2d 1166, 1169 (D.C. 1991) (When imposing a sentence, the court "may conduct an inquiry broad in scope, largely unlimited as to the kind of information received and the source from which it is received.").

Though at sentencing the Court is not bound by the Federal Rules of Evidence's admissibility standards, the Court should only consider information that has "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a).

## IV.   THE COURT SHOULD IMPOSE A SENTENCE OF INCARCERATION AT THE TOP-END OF THE APPLICABLE GUIDELINE RANGES

The criminal conduct in this case was grievous.  While on-duty as a sworn law enforcement officer, the Defendant committed involuntary manslaughter.   The shooting was objectively unreasonable and lacked legal justification.  As discussed below, the applicable guideline ranges are 36 to 84 months for the D.C. Code violation and 37 to 46 months for the federal violation.  This Court should sentence the Defendant to 84 months of incarceration for his manslaughter conviction and 46 months of incarceration for his § 242 conviction, to be served concurrently.   Such a guideline sentence acknowledges the seriousness of the offense, provides important general deterrence, promotes the rule of law, and avoids unwarranted sentencing discrepancies, as is required under both federal and D.C. law.

### a. The Applicable Guideline Ranges

Pursuant to the terms of their plea agreement, the parties agree on the applicable guideline ranges.  *See generally* ECF No. 21 at 3-5.

For the death-resulting § 242 violation, the applicable federal sentencing guideline calculation is:

| | | |
|---|---|---|
| U.S.S.G. § 2H1.1(a) → | Base Offense Level | |
| U.S.S.G. § 2A1.4(a)(2)(A) | Involuntary Manslaughter w/ Reckless Conduct | 18 |
| U.S.S.G. § 2H1.1(b)(1) | Offense Committed Under Color of Law | +6 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | TOTAL | 21 |

The Defendant has a criminal history score of zero.  But because the offense conduct involved the use of violence, resulted in death, involved the use of a firearm, and is covered by U.S.S.G. § 2H1.1, the Defendant is not eligible for the zero-point offender adjustment.  *See* U.S.S.G. §§ 4C1.1(3), (4), (7), and (8).

The agreed-upon federal guideline range is therefore 37 to 46 months.

Under the District of Columbia's Voluntary Sentencing Guidelines Manual, the Defendant's involuntary manslaughter conviction under D.C. Code § 22-2105 is calculated as:

| | |
|---|---|
| Offense Level | Group M5 |
| Criminal History Category | A |
| Guideline Range | 36 to 84 months |

The parties agree that sentences for the federal civil rights and D.C. Code manslaughter convictions should run concurrently.  *See* ECF No. 21 at 4; *see also* U.S.S.G. § 5G1.3(c).

14

### b. The Relevant U.S. and D.C. Code Factors Support the Imposition of a Sentence at the Top-End of the Applicable Guideline Ranges

### i. The Sentence Imposed Must Reflect the Seriousness of the Offense

The Defendant is being sentenced for grave offenses. The United States Constitution protects *everyone* in this country. The protections enshrined in the Bill of Rights are among the most important. Individuals cloaked in and exercising state power have a solemn obligation to guard those rights. Through the breadth of § 242, federal criminal law has long recognized the seriousness of a police officer willfully depriving an individual of their constitutional rights while the officer is acting under color of law. The federal sentencing guidelines reflect this seriousness by making it clear that an officer who violates the law should expect a *greater* punishment than a civilian who engages in the same misconduct. *See generally* U.S.S.G. § 2H1.1(b); *see also United States v. Webb*, 214 F.3d 962, 965 (8th Cir. 2000) (the § 2H1.1(b) enhancement was "justified on the wholly independent ground that [the defendant] was a 'public official' at the time of the offense.") (citing *United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999)); *United States v. Hickman*, 766 F. App'x 240, 251 (6th Cir. 2019) (same).

Even among color of law offenses, the seriousness of this specific case is magnified. It not only involves a police officer's willful violation of an individual's Fourth Amendment right to be free from objectively unreasonable force; it also involves an unjustified killing.

Noting the seriousness of civil rights offenses generally and this offense in particular is entirely consistent with recognizing the tremendous demands placed on law enforcement officers and the dangers posed to them as they carry out their difficult jobs. The relevant constitutional standards factor in and incorporate those dangers. *See generally Graham v. Connor*, 490 U.S. 386, 396-97 (1989). And when officers address such dangers and circumstances in an objectively reasonable way, no constitutional violation has occurred. *Id.*

15

The Defendant did not act reasonably—as he admits.  He took a life without legal justification.  Any claim that his conduct was not egregious is negated by the starkly different conduct of every other officer on the scene—officers who faced the same circumstances and dangers as the Defendant but who took reasonable steps and refrained from needlessly taking a life.

An'Twan Gilmore had the right to benefit from the protections afforded to him by the Constitution.  His civil rights were denied.  He was the victim of manslaughter.  The ultimate sentence imposed in this case must reflect the tragedy and seriousness of these crimes.

### ii.  The Sentence Imposed Must Afford Adequate General Deterrence and Promote Respect for the Rule of Law

Given the nature and seriousness of the offense, the sentence imposed must deter similar conduct in the future by others and promote respect for the rule of law.

Our society places tremendous power in police officers.  That power is given with the goal that it will be used to keep people safe and protect the rule of law.  Almost by definition, using police power to violate someone's rights and commit manslaughter amounts to an attack on the rule of law.  The negative effects of such acts are hard to quantify or overstate, and they can easily and quickly ripple through entire communities.

The overwhelming majority of law enforcement officers uphold the Constitution and protect individuals' civil rights.  They respect the rule of law.  They realize they are not above it and no one else is below it.  But they are also likely to understand or expect that a conviction for willfully using unconstitutional force that results in death will be accompanied by a significant custodial sentence.  Such deterrence is important and necessary, particularly when some fear that the justice system does not treat everyone equally.

In light of these considerations, it is incumbent on the Court to impose a significant sentence that unmistakably promotes the rule of law, provides adequate deterrence, and furthers the concept of equal justice under the law.

### iii. The Sentence Imposed Must Avoid Unwarranted Sentencing Disparities

An 84-month sentence is appropriate and aligns with sentences imposed in other death-resulting § 242 cases and involuntary manslaughter convictions.

A comparison to the high-profile murder of George Floyd is apt. In that case, the defendant whose use of objectively unreasonable force caused Floyd's death was sentenced to 252 months in prison. *See United States v. Chauvin*, Case No. 21-cr-108-TNL-1 (D. Minn.). Two on-scene officers who became co-defendants for failing to intervene to stop the use of force were sentenced to 42 and 36 months respectively after being convicted at trial. *See United States v. Thao*, Case No. 21-cr-108-TNL-2 (D. Minn.); *United States v. Kueng*, Case No. 21-cr-108-TNL-3 (D. Minn.). Another officer was sentenced to 30 months in prison after a jury convicted him of being deliberately indifferent to Floyd's serious medical needs. *See United States v. Lane*, Case No. 21-cr-108-TNL-4 (D. Minn.).

The facts of this case suggest that Defendant Jevric's culpability sits below that of the officer who maliciously murdered Floyd, but above that of the on-scene officers who did nothing to stop the murder. A sentence of 84 months would thus reflect the Defendant's culpability here in a way that is consistent with those past sentences in Minnesota.

Another death-resulting § 242 conviction occurred in *United States v. Slager*, Case No. 2:16-cr-378-RMG-1 (D.S.C.). There, an on-duty officer unreasonably shot and killed a fleeing man. Slager pleaded guilty to a death-resulting § 242 violation. The sentencing court faced a question as to whether the offense conduct should be treated as second-degree murder or voluntary

manslaughter.  *See United States v. Slager*, 912 F.3d 224, 227 (4th Cir. 2019).  The court determined that Slager committed second-degree murder and obstructed justice, and he was sentenced to twenty-years imprisonment.  *Id*.  The Fourth Circuit rejected a challenge to the sentence and affirmed the district court's conclusions.  *Id*.  Though here the government is not asking the Court to use second-degree murder as the base offense level cross-reference or to add an enhancement for obstruction of justice, the affirmed twenty-year sentence in *Slager* shows the seriousness with which federal courts rightly treat comparable death-resulting § 242 convictions.

The government's requested sentence is also consistent with other less well-known § 242 convictions in cases involving death.  For example, last year a judge in the Central District of Illinois sentenced several correctional officers for a civil rights violation resulting in death.  The lead defendants, who refused to accept responsibility for the murder and also obstructed justice, received twenty-year sentences.  *See United States v. Sheffler*, Case No. 3:19-cr-30067-SEM-1 (C.D. Ill.); *United States v. Banta*, Case No. 3:19-cr-30067-SEM-3 (C.D. Ill.).  Another co-defendant officer who accepted responsibility and cooperated with the government in its prosecution of the jail-based murder received a sentence of 72 months.  *United States v. Hedden*, Case No. 3:19-cr-30067-SEM-3 (C.D. Ill.).  Imposing a lower sentence on Defendant Jevric in this case than a cooperating witness officer received there would represent an unwarranted disparity.

The government's requested sentence also aligns with local practice in other involuntary manslaughter cases.  For example, last fall, a defendant in Superior Court received a twelve-year sentence for involuntary manslaughter and assault with a dangerous weapon.[9]  Just weeks ago,

---

[9] Press Release, U.S. Attorney's Office for the District of Columbia, "Pennsylvania Man Sentenced to 12 years in Prison for Involuntary Manslaughter and Assault with a Dangerous Weapon" (Nov. 17, 2023), https://www.justice.gov/usao-dc/pr/pennsylvania-man-sentenced-12-years-prison-involuntary-manslaughter-and-assault (last visited July 24, 2024).

another defendant in Superior Court received an eight-year sentence for involuntary manslaughter and attempted robbery.[10]

### iv.  The Defendant's History and Characteristics

The Defendant has a record of public service, working as a law enforcement officer since 2007.  He has no criminal history.  The government credits his acceptance of responsibility and acknowledges that the need for general deterrence is far greater than the need for specific deterrence in this case.  But none of this makes the fact that he killed a man without justification any less egregious.  Given the seriousness of the offense and past sentences in similar cases, the Defendant's personal characteristics do not warrant a variance from the guideline range (which already accounts for his acceptance of responsibility and criminal history).

There is also no reliable information indicating that the Defendant has any medical conditions that diminish his culpability for the offense conduct or his ability to serve his sentence. All reliable information in the government's possession—including statements from his past supervisors—indicates that he was physically, cognitively, and mentally fit to serve for several years leading up to and including 2021.

The defense has indicated that it will seek to present information that purportedly calls into question the Defendant's cognitive abilities when the crime occurred in 2021 and his future physical health.  As expressed in the government's objections to the Probation Department's initial Presentence Report ("PSR"), which are being filed separately, the medical material presented by the defense thus far is remarkable mostly for its lack of reliability.  And because it is so unreliable, the Court should not consider it.  *See* U.S.S.G. § 6A1.3(a).

---

[10] Press Release, U.S. Attorney's Office for the District of Columbia, "Eight Year Prison Term Handed Down in Connection With Teen Crime Spree That Ended in Death" (July 12, 2024), https://www.justice.gov/usao-dc/pr/eight-year-prison-term-handed-down-connection-teen-crime-spree-ended-death (last visited July 24, 2024).

## V.     RESTITUTION

### a.   Count 1: 18 U.S.C. § 242

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.  Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Here, two general restitution statutes provide such authority.  First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.  Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction, including a "representative of the victim's estate" or "another family member" in cases where the victim is deceased. *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18

U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097; 18 U.S.C. § 3663(b); 18 U.S.C. § 3663A(a)(2) (MVRA). Finally, under both statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[11] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job is to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in

---

[11] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

Title 21 or Title 49.  18 U.S.C. § 3663(a).  In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).

By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," 18 U.S.C. § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[12]

Given these principles, the Court should order defendant Jevric to pay restitution to Gilmore's surviving family members for his § 242 conviction.  The defendant willfully abused his position as a sworn law enforcement officer to shoot and kill Gilmore without any lawful justification, the ultimate violation of Gilmore's constitutional rights.  Because of the defendant's egregious and unconstitutional actions, a young man's life was cut short for no reason and the lives of his surviving family members were profoundly harmed.

The surviving family members are represented by counsel.  The government continues to confer with that counsel regarding the family's reasonable request for restitution.  The government anticipates providing the Court with more information related to that request prior to sentencing.[13]

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii) and 3663A(c)(3)(B).

[13] As the Court is aware of from the change of plea hearing, members of the family intend to address the Court and provide a victim impact statement at the sentencing hearing.

### b. Count 2: Involuntary Manslaughter

Under D.C. Code § 16-711, the Court also may order the defendant to pay restitution for his involuntary manslaughter conviction.  In fashioning such a restitution order, the Court "shall" consider, among other things, "the actual damage of each victim" and "the resources of the defendant."  D.C. Code § 16-711(b).  For the same reasons articulated above concerning Count 1, restitution is appropriate for the defendant's involuntary manslaughter conviction under Count 2. This statutory authority therefore provides the Court with additional grounds to order the Defendant to pay restitution to Gilmore's family.

## VI.    FINE

Each of the Defendant's convictions subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3); D.C. Code § 22-3571.01(b)(12).  In determining whether to impose a fine, the Court should consider the Defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d).  The government is not seeking a fine in this case.

## VII.    CONCLUSION

To account for the gravity of this offense, provide adequate deterrence, protect and promote the rule of law, and avoid unwarranted sentencing disparities, the Court should impose a sentence of 84 months of incarceration for the involuntary manslaughter conviction and 46 months of incarceration for the federal civil rights violation, to be served concurrently and followed by a three-year period of supervised release.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Risa Berkower*
RISA BERKOWER (NY Bar No. 4536538)
TIMOTHY VISSER (DC Bar No. 1028375)
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-6782 (Berkower)
(202) 252-2590 (Visser)
risa.berkower@usdoj.gov
timothy.visser@usdoj.gov