**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          :
UNITED STATES OF AMERICA            :
                                          :          No. 23-cr-63-RDM
                                          :
v.                                         :
                                          :
ENIS JEVRIC,                           :
                                          :
                    _Defendant_.        :
_____:

## DEFENDANT'S SENTENCING MEMORANDUM

Enis Jevric is a forty-two-year-old former refugee who immigrated to this country as a child to escape genocide, became a citizen as a young man, and then devoted nearly fourteen years of his life to protecting the citizens of the District of Columbia. He joined the Metropolitan Police Department ("MPD") in April 2007 and rose to the rank of sergeant in 2014, spending over a decade on patrol and supervising other patrol officers. Sgt. Jevric responded to numerous calls for assistance while subjecting himself to violence, firearms, and trauma, all to the detriment of his own mental and physical health. When Sgt. Jevric was called into service to defend the United States Capitol on January 6, 2021, he heroically pushed back a mob of individuals inside the building, earning himself a Ribbon of Valor. One year earlier, he received a Life Saving Medal for his actions in saving the life of a D.C. resident who was suicidal.

Sgt. Jevric has spent the better part of his life helping people, not hurting people, protecting life, not taking life. Throughout the investigation of this case and in the letters attached hereto, fellow officers and supervisors speak of Sgt. Jevric's kindness, work ethic, and strong character, and confirm that he is someone who does not exhibit malice towards anyone. Prior to the events at issue, Sgt. Jevric never had a sustained finding of excessive force.

The events underlying this case are tragic by any estimation. A family is without a loved one, Sgt. Jevric's life will never be the same, and the tension between the community and law enforcement remains unresolved. While rendering any sentence is never easy, it is particularly challenging here, when Sgt. Jevric never intended to harm anyone in the early morning hours of August 25, 2021. As he did for over a decade, Sgt. Jevric came to protect the community and his fellow officers from an extremely dangerous situation — a man unresponsive in a running car, with his foot on the pedal and a firearm visible in his waistband.

As discussed below, over a dozen officers, from all different backgrounds and races, spent significant time trying to defuse the situation, by knocking on the windows, using their flashlights to illuminate the vehicle, trying to open the locked doors, and otherwise giving the driver every opportunity to awaken and comply with law enforcement's request to stop and exit the vehicle. Given this extremely dangerous situation, almost every officer on scene, including Sgt. Jevric, had their firearms pointed and at the ready, including an officer with an assault rifle, to be used if the driver were to fire against the officers surrounding the vehicle. This was not an exercise, but the reality of what officers face day in and day out in the Nation's Capital, with the proliferation of guns and shootings. Then, in the split seconds as the driver began pulling away — ultimately heading toward police cruisers that Sgt. Jevric believed were occupied by law enforcement officers — Sgt. Jevric, looking through the vehicle's tinted windows, saw the driver's hand rise up and grab something and made the decision to discharge his firearm. He believed it was a gun.

To its credit, as part of the guilty plea in this case, the Government did not require, nor even suggest, that Sgt. Jevric acknowledge his actions were *intentional*, as they were reckless, a term more akin to tort law than federal civil rights offenses. Notwithstanding, Sgt. Jevric took responsibility for his actions and pled guilty to two separate felonies, including involuntary

2

manslaughter (the *unintentional* and *negligent* death of another). Regardless of his mental state, Sgt. Jevric knows that his actions had life-changing consequences. The family and friends of An'Twan Gilmore will never have him in their lives again.

Sgt. Jevric's life will also never be the same. He will never work in any law enforcement capacity, will live the remainder of his life as a convicted felon, and will bear the emotional trauma of his regrettable actions on August 25, 2021, as well as any civil consequences that may result from the $100 million-dollar wrongful death lawsuit currently pending against him. As discussed below, in addition to the external factors present on August 25, 2021, Sgt. Jevric's medical condition made it extremely difficult for him to process the split-second decision that he faced when confronted with an armed individual, and his condition warrants further treatment and not prolonged incarceration.

Respectfully, Sgt. Jevric asks this Court to consider the mere seconds of his unintentional conduct alongside his fourteen years of service to the community and otherwise lawful life since his immigration to this country when rendering a sentence in this case.

## FACTUAL BACKGROUND

### Personal History and Characteristics

Enis Jevric was born in 1981 in Montenegro, Yugoslavia. *See* Draft Presentence Report ("PSR"), ¶ 58 (D.E. 29). He grew up in absolute poverty, lacking safe drinking water, in a small town of approximately 100 people. *Id.* ¶¶ 58-59. When Sgt. Jevric was three years old, his father left to find work in the United States and would then send money back to his family. *Id.* ¶ 59. In 1991, after war broke out in Yugoslavia, Sgt. Jevric, his mother, and his siblings sought political

asylum in the United States for religious persecution (they were Muslim).[1] *Id.* ¶ 60. They immigrated to New York City and resided in a small, one-bedroom apartment, remaining in a lower-income socioeconomic status throughout Sgt. Jevric's childhood. *Id.*

Growing up, Sgt. Jevric enjoyed spending time outside, but had difficulty meeting others in the community because he did not speak fluent English. *Id.* Notwithstanding the challenges he faced as an immigrant, Sgt. Jevric graduated from high school in 1999 and subsequently became a naturalized citizen. *Id.* ¶¶ 66, 86-87. Thereafter, he obtained a bachelor's degree in criminal justice and a master's degree in police administration, both from John Jay College of Criminal Justice located in New York City. *Id.* ¶¶ 86-87.

As a devout Muslim, Sgt. Jevric volunteers at a mosque in Arlington, Virginia, which he has attended since 2010, and regularly donates food and assists in the preparation of religious services. *See* PSR, ¶ 93; Ex. 5 (detailing Sgt. Jevric's commitment and assistance to his religious community); Mar. 5, 2024 Minute Order (permitting modification of release conditions to permit Sgt. Jevric to attend certain prayer services). Sgt. Jevric also travels periodically to New York to visit and care for his elderly parents, as his mother has breast cancer, and his father is disabled and has difficulty moving around. *See* PSR, ¶¶ 20, 62; Ex. 4 at 3 (detailing caretaking duties for his parents).

## Law Enforcement Service

Sgt. Jevric became a police officer in 2007 and was promoted to the rank of sergeant in 2014. PSR, ¶ 92. While assigned to the Adams Morgan and club zone areas in the District, he

---

[1] In Bosnia and Herzegovina, the Serbian army launched a military campaign from 1992 to 1995 to "cleanse" the country of its Muslim civilian population. Women were raped and tortured and, in one operation, 8,000 men were killed. PSR, ¶¶ 60-61. During the war, Sgt. Jevric's uncle was taken off a train when the Serbian army was checking passports (and removing passengers with Muslim names) and was never seen or heard of again.

sustained five head injuries/concussions due to being assaulted by suspects, some of whom were intoxicated. *Id.* ¶ 95. In fourteen years of service, Sgt. Jevric never had a sustained finding of improper use of force and was well liked and respected among his fellow officers, including his supervisors:

- Sgt. Jevric "was a professional," "had such a positive outlook about the Department and the job," "was a leader," and "was a supervisor [that] officers could go to with an issue and he would do whatever he could to resolve the issue" (attached hereto as Exhibit 2);

- Sgt. Jevric "consistently demonstrated integrity, responsibility, and a strong work ethic," "was dependable, willing to go the extra mile, and routinely completed his mission efficiently," and "was my go-to sergeant, and I could count on his actions to be reasonable and prudent" (attached hereto as Exhibit 3);

- Sgt Jevric "is highly respected and cherished by the members of the Fifth District, to include the command staff, his peers and subordinates," and "is an outstanding sergeant and cares for the safety and wellbeing of the officers he works with, as well as the citizens and visitors of the District of Columbia" (attached hereto as Exhibit 4);

- Sgt. Jevric "was a dedicated and loyal officer," "displayed good work integrity and etiquette to the community he work[ed] in, his coworkers and supervisors," and "was always reliable to do his job with great professional[ism]" (attached hereto as Exhibit 6);

- Sgt. Jevric is a "good guy" and a "hard worker," and while supervising him there was "no concern for his judgment or otherwise as an MPD officer" (Gov't Obj's to PSR, Ex. 1 (D.E. 30-1)); and

- According to MPD Commander, Sgt. Jevric was a "good cop" and "reliable supervisor," and while a supervisor, there were no "issues with Jevric's decision-making or supervisory skills" (Gov't Obj's to PSR, Ex. 2 (D.E. 30-2)).

*See also* PSR, ¶ 95 (describing Sgt. Jevric as "well-liked and admired by the officers he supervised"); Toran Mar. 11, 2022 GJ Tr. at 14:12-16 (**Q.** "What is Sergeant Jevric's reputation in the district? **A.** In my opinion, he has a stellar reputation. He's a hard worker. He's someone you can go to, talk to, ask questions.").

In April 2020, Sgt. Jevric received the MPD Life Saving Medal after he was dispatched to the report of a suicidal individual and worked in tandem with other officers to aid the individual

and save his life. PSR, ¶ 94. He also received an MPD Ribbon of Valor, on April 23, 2021, for his role in responding to the protests at the United States Capitol on January 6, 2021. *Id.* As described by a colleague present at the Capitol, Sgt. Jevric led his platoon of officers in a prolonged defense of the building:

> That day Sergeant Jevric and the members were at their best and ready to serve and deploy. The officers were ready because of the guidance from Sergeant Jevric and the other CDU 51 sergeants. The officers acted in response to the sergeants' directives with swift and collective action. They did so because they respected their sergeants, the sergeants of CDU 51, they respected Sergeant Jevric.
>
> \*       \*       \*
>
> During this event, Sergeant Jevric led members of CDU 51 from the front. . . The members of CDU 51 followed the sergeants' directives and put themselves in harm's way, not just out of dedication to their job, but out of respect and admiration of their sergeants, out of respect and admiration for Sergeant Jevric.

Ex. 4 at 5-6. The enclosed photograph depicts the unit that Sgt. Jevric was leading, with Sgt. Jevric taking the lead up front:



## Mental Health and Current Medical Condition

The Metropolitan Police Employee Assistance Program ("MPEAP") is a "counseling program for police officers, police officials, and family members" that has "four full-time, licensed

6

therapists who have historical experience working with law enforcement families." *See* https://www.mpeap.com/about.html, last visited August 1, 2024. MPEAP is a partnership between MPD and its Union, and officers who have suffered traumatic events are encouraged to seek assistance pursuant to an MPD General Order (attached hereto as Exhibit 8).

As set forth in the PSR, Sgt. Jevric began treatment with Dr. Beverly Anderson, MPEAP's Clinical Director, on July 26, 2022.[2] PSR, ¶ 74. He presented with symptoms consistent with post-traumatic stress disorder ("PTSD") and additional vestibular and neurological symptoms related to a complex medical history of chronic cholesteatoma and ear infections, numbering two or three yearly for eight years before his first surgery in 2015. *Id.* Sgt. Jevric's symptoms included hearing loss, dizziness, loss of balance, headache, brain fog, zoning out, memory loss, earache, pressure in the head, timing and space disorientation, neck stiffness, difficulty swallowing, and sharp pain in the frontal area and left temporal area. *Id.* His prior ear nose and throat doctor tried to treat his chronic ear infections and, after multiple failed attempts, in 2015, Sgt. Jevric was referred to Dr. Ashkan Monfared at George Washington University, who specializes in neurological diseases of

---

[2] Dr. Anderson, the Clinical Director, specializes in police and trauma psychology and is a qualified expert in the areas of post-traumatic stress disorder and police trauma. She holds master's degrees in clinical psychology and counselor education, and PhDs in counseling psychology and clinical psychology. Dr. Anderson completed a residency at Walter Reed Army Medical Center, Department of Neurology/Defense and Veterans Brain Injury Center, focusing on treating PTSD. *See* https://www.mpeap.com/anderson.html, last visited, August 1, 2024. Dr. Anderson prepared an evaluation of Sgt. Jevric for United States Probation on May 28, 2024 (PSR, ¶ 57) and a copy was filed under seal with the Court on August 1, 2024. In preparing her evaluation, Dr. Anderson relied on medical records provided to her by Sgt. Jevric's treating physicians, certain of which are directly incorporated into her written evaluation. The Government's cavalier and unprecedented request to have this Court disregard Dr. Anderson's report and the medical records referenced therein should be rejected, as U.S. Probation routinely obtains medical records and evaluations as part of its presentence report investigations. Because medical and mental health information is confidential in the employment context, it is not only unsurprising, but also expected, that Sgt. Jevric's fellow officers would not know his medical history and prior medical treatment, unless he voluntarily disclosed it to them.

the ears and nerves that connect the ears to the brain. *Id.* Sgt. Jevric was diagnosed with severe cholesteatoma and underwent an extensive surgical procedure to remove the invasive growths that destroyed his ear and mastoid area. *Id.* The disease was so advanced that additional surgeries were performed in 2016 and 2017. *Id.* Dr. Monfared has indicated to Dr. Anderson that Sgt. Jevric is immunocompromised because his inner ear is "open" and unprotected, thus presenting increased infection risk. *Id.* As a result, Sgt. Jevric requires treatment by Dr. Monfared every four months. *Id.* If left untreated, serious complications could result to Sgt. Jevric, including brain abscess, sepsis, and even death. *Id.*

Dr. Anderson's evaluation also revealed that she referred Sgt. Jevric to neurologist Dr. Peter Bernad and he conducted an initial assessment on March 8, 2024. *Id.* ¶ 75. Dr. Bernad ordered numerous diagnostic tests, to include a Brain PET Scan, which revealed that Sgt. Jevric's temporal lobes are impaired and that the absence of activity is due to the loss/death of neurons. *Id.* Despite significant impairment of hearing, vestibular disorder, chronic infection, and chronic cholesteatoma, Sgt. Jevric was in a "full duty" status in August 2021. *Id.* According to Dr. Anderson, the resulting infections may have contributed to impairment in the temporal lobes, leading to a diagnosis of frontotemporal dementia for which there is no cure and no treatment. *Id.* The many years of untreated infections possibly contributed to, or were, the primary cause of his current diagnosis. *Id.* Sgt. Jevric had no knowledge of the severity of his impairments, and his day-to-day life seemed normal except for the ongoing problems with infection, which he took in stride. *Id.*

Dr. Anderson further opined that Sgt. Jevric's ability to perform his duties in potentially life-threatening circumstances was seriously compromised. *Id.* ¶ 76. Because police officers must make life and death decisions in milliseconds, they must be in good health, as responses to

potentially life-threatening encounters require a body to be in peak conditions. *Id.* According to Dr. Anderson, given Sgt. Jevric's medical problems and impairments of his limbic system, hearing, vestibular system, and temporal lobes, he may not have been able to process the extraneous stimuli impinging on his senses all at once. *Id.* His reactions to what he assessed as a "death threat" led him to firing his weapon. *Id.*

Dr. Anderson's evaluation also notes that Sgt. Jevric was "deeply saddened, tormented, and disturbed" by the fatal shooting, which has intensified his trauma symptoms. *Id.* As a devote Muslim, Sgt. Jevric knew he had violated one of the most sacred tenants of Islam, forbidding taking of a human life. *Id.* He stated, "to take even one life is linked to taking all the lives of humanity." *Id.*

### Sgt. Jevric's Character and Reputation in the Community

Accompanying this submission are numerous letters of support from Sgt. Jevric's law enforcement colleagues and members of his religious community (*see* Exs. 2-6), all of whom similarly and universally attest that Sgt. Jevric is a caring and thoughtful person, remorseful for his actions, and deserving of leniency in this case. Short excerpts from some of those letters are enclosed:

### Retired Police Officer Darla Sandula (Exhibit 2)

Sergeant Jevric had such a positive outlook about the Department and the job. . . . [He] would often express his gratitude for his career and the opportunities it gave him as an immigrant from Yugoslavia. He was so proud to be an American Citizen. . . .

That morning, Sergeant Jevric did not have to take the shield, . . . [y]et [he] took 'point man' on this dangerous situation. Putting himself in the position of danger instead of his people. . . . A situation with a known weapon and a split-second reaction time Sergeant Jevric took it all on his shoulders a split-second decision, I wouldn't wish on anyone - let alone such a wonderful man. . . . I have nothing but the utmost respect for a supervisor, leader, and human being that does that so his troops, his officers, his people didn't have to take point. Being human and a cop,

there is no perfection, but I will say with my whole heart I believe Sergeant Enis Jevric lives trying to make good decisions . . . and has lived trying to do right by all[.]

### Lieutenant Peter Sheldon (Exhibit 3)

Mr. Jevric is a kind, compassionate person with an excellent moral compass who is always willing to help others in need. . . . Mr. Jevric supervised a squad of officers during some of the worst civil unrest times in my twenty-five-year career with the Metropolitan Police Department. I found Mr. Jevric to show empathy and keep a cool head while being verbally and physically abused by protestors for over two years. Mr. Jevric never acted in a manner inconsistent with the values and integrity of his position. . . .

On January 6, 2021, I commanded one of the two full Metropolitan Police Department Civil Disturbance Platoons that entered the United States Capitol. Mr. Jevric was one of four sergeants I had in my platoon. His leadership skills were evident as he took decisive action and led his officers with bravery. Mr. Jevric's actions helped restore the natural flow of democracy to our country, and I am proud to have served with him.

### Lieutenant Savyon Ilon Weinfeld (Exhibit 4)

Enis is a companionate man, dedicated to the city, the citizens, the police officers of MPD, his family and friends. Enis has no evil in his heart and I know that he wishes that he did not have to take the actions that took place on August 25, 2021. Enis is highly respected and cherished by the members of the Fifth District, to include the command staff, his peers and subordinates . . . Enis loves this country and its people and dedicated his life to the country and its citizens and visitors by becoming a police officer in the nation's capital.

### Shamsul Alam (Exhibit 5)

Enis volunteered to help and since then every month of Ramadan he would help in serving other[s] before serving himself. On a weekly basis, he helps with preparing the back area of the mosque in setting up the prayer rugs and overall cleaning of the property. He helps financially in supplying food items for the mosque. He is very responsible and dedicated to helping others in time of need. Our community trusts and respects him for his dedication to helping anyone that he can.

### Retired Sergeant Trinette Greene (Exhibit 6)

Enis Jevric . . . was a dedicated and loyal officer. He displayed good work integrity and etiquette to the community . . . [h]e was always reliable to do his job . . . was always open to constructive criticism and worked to better himself as an officer.

## Sgt. Jevric's Acceptance of Responsibility

When charged in this case, Sgt. Jevric did not file any motions: (i) challenging the Government's Indictment; (ii) demanding the production of additional evidence; or (iii) seeking to exclude any evidence. At no time was any trial date requested and Sgt. Jevric routinely consented to the exclusion of time under the Speedy Trial Act. Absent pleading guilty at his initial presentment upon arrest warrant, it does not appear Sgt. Jevric could have accepted responsibility any sooner in this case. He saved the Government and the Court precious resources by not litigating this case and he spared Mr. Gilmore's family the trauma of having to attend and testify in a trial. His early acceptance of responsibility, combined with his exceptional performance on supervision and his complete absence of criminal history or sustained findings of unreasonable force as a police officer, warrants significant consideration by the Court in rendering a sentence in this case. The Government's willingness to afford Sgt. Jevric a three-point reduction in the offense level confirms his early acceptance of responsibility in this case. *See* PSR, ¶ 9. As discussed below, the fact that the D.C. Voluntary Sentencing Guidelines do not take into consideration acceptance of responsibility only reinforces why a sentence at the top of those guidelines would be wholly inappropriate.

None of this undermines the fact that, since the shooting, Sgt. Jevric has experienced significant trauma resulting from the regrettable loss of life caused by his actions. Sgt. Jevric's remorse and sincere condolences are memorialized in his letter to the Court (attached hereto as Exhibit 1), an excerpt of which is below:

> I apologize to the community and to my fellow police officers. More importantly, I express my sincere condolences to the friends and family of An'Twan Gilmore. Any loss of life is tragic, especially when it is the result of actions that I undertook. I am sorry for their loss. I am sorry for their pain. I hope and pray that in time they know that my actions were not a product of any racism as claimed by some in the press or as desire to kill or hurt anyone. I have never had those feelings while being

a police officer for fourteen years in the District of Columbia. . . . The actions I took were the product of a dangerous situation with an individual with a firearm on his waistband. My actions were reckless, but they were never motivated by a desire to hurt anyone. Me as a person, and my faith as a Muslim, values life and humanity. I ask that you judge me not on the split-second decision I made in a fourteen-year career, but on the entire body of my life. I will never forget what I did. It will be with me for the remainder of my life.

### Facts Underlying the Event

On August 25, 2021, at approximately 2:45 am, radio traffic confirmed that MPD officers had already responded to the traffic light at the intersection of New York and Florida Avenues in Northeast, Washington, D.C. At approximately 2:47 a.m., radio dispatch confirmed the report of man "passed out" in a Black BMW. More specifically, present at the location, in the thruway, was an unresponsive male driver operating a 2008 BMW 535 Xi bearing Maryland license plate 1ET4183. The vehicle's engine was running and the brake lights were illuminated. The vehicle was registered to a female. Visible in the driver's waistband was a firearm. The driver was later identified as twenty-seven-year-old An'Twan Gilmore.

At the time officers responded, separate and apart from the driver's unresponsiveness while operating a vehicle in a public thruway with the engine running, the driver was in violation of District of Columbia regulations for the transportation of firearms, which cannot be carried on the person in a vehicle. Other pertinent questions included whether the firearm was registered, whether the driver had a license to possess a firearm at home or place of business or was otherwise prohibited from being in possession of a firearm, and what the driver was doing with the firearm.

Considering the dangers of an incapacitated individual in physical possession of a firearm, in a running car in the intersection of a thruway, MPD was required to ensure the safety of other drivers and pedestrians. Officers were also required to investigate the status of Mr. Gilmore, *one*, to see if he was physically stable, and *two*, to ensure that he was not prohibited from being in

possession of a firearm (a dangerous offense) and was not using the firearm for unlawful purposes, or was not otherwise a danger to himself and to other individuals while armed and incapacitated behind the wheel of a moving vehicle.

It would be subsequently learned that the firearm was loaded, and that the firearm *originated* from South Carolina. It was also learned that Mr. Gilmore had an active arrest warrant for Assault with a Dangerous Weapon (Firearm), and that he previously had been convicted of a felony crime of violence, which made it unlawful for him to be possession of a firearm on the morning in question or in the event leading to the pending arrest warrant. *See* PSR, ¶ 153 (detailing relevant history), https://wjla.com/news/local/dc-police-body-camera-footage-released-shooting-death-27-year-old-antwan-gilmore, last visited August 1, 2024.

At approximately 2:55 a.m., radio dispatch confirmed additional units had already responded. At 2:57 a.m., a request for a shield was dispatched. At 2:59 a.m., dispatch reported to all officers that the driver of the vehicle had a gun in his waistband. Officers closed the entire block from pedestrian and vehicle traffic given the inherent danger of the situation for all those present. Reports of shots fired at 3:08 a.m. was noted by dispatch immediately thereafter. Prior to Mr. Gilmore trying to flee the scene and shots being fired, officers knocked on the window of the vehicle, used flashlights, tried the doors, and made every possible attempt to get Mr. Gilmore's attention while he was armed and passed out in the running vehicle.

The presence of a firearm on a driver operating a vehicle in the public thruway creates a dangerous situation for the driver, for citizens in the District, and for all officers involved, as shown by the enclosed photograph of all officers (to include Sgt. Jevric) with weapons drawn, as well as,

an officer using an assault rifle.[3] The inherent danger to all present heightened when Mr. Gilmore

looked directly at officers and drove off into the direction of the two police cruisers visible up the

block. The yellow arrow reflects the officer with the assault rifle and the blue arrow indicates Sgt.

Jevric:



*See* Gov't Sent. Mem., Ex. 1 (D.E. 31-1).

As explained by fellow officers, Sgt. Jevic volunteered to expose himself to danger as the

"point person" holding the shield and to take on the most challenging responsibility on scene:

> Sergeant Jevric responded from the street to the Fifth District to obtain a ballistic
> shield to bring to the scene. Furthermore, once on the scene, he didn't pass the
> shield onto an officer and ordered them to put themselves in harm's way with that
> shield. Enis took command of the shield himself and put himself in harm's way at
> the front of a vehicle, with only information at the time being that the driver of the
> vehicle had a visible handgun in his waistband. Enis prioritizing the acquisition of
> the shield clearly shows his intent that night was to safeguard life, not take life. I
> know that Enis's actions on August 25th, 2021 were not done with malice towards

---

[3] In its sentencing memorandum (at 6), the Government gives the impression that this situation is
common and routine. It is not. *See, e.g.*, Cote Feb. 4, 2022 GJ Tr. at 55:5-11 (**Q.** "How often are
those people armed or how often is there a weapon in the car? **A.** I don't believe I've ever had a
call where the person was drunk or high behind the wheel and asleep with a gun. **Q.** This was the
first time you remember? **A.** Correct."); Collier Feb. 18, 2022 GJ Tr. at 67:7-10 ("I could tell you
that that was the first time I've seen somebody armed in the car asleep."); Ex. 2 at 2 ("[U]s officers;
having no training for a situation such as this and the tinted windows making the situation even
more precarious").

> An'Twan, but done believing it was necessary to safeguard the safety of the officers on the scene of the event, as well as safeguarding himself.

*See* Ex. 4 at 2.

> Sergeant Jevric took 'point man' on this dangerous situation. Putting himself in the position of danger instead of his people. *Point man* is one of the most dangerous and stressful jobs in the service. He took that from his people and placed it on himself, not expected but he did it. A situation with a known weapon and a split second reaction time Sergeant Jevric took it all on his shoulders a split-second decision, I wouldn't wish on anyone- let alone such a wonderful man. . . . I have nothing but the utmost respect for a supervisor, leader, and human being that does that so his troops, his officers, his people didn't have to take point.

*See* Ex. 2 at 2; Sandula Jan. 21, 2002 GJ Tr. at 20:14-16 ("[H]e took the lead with the ballistic shield. He put himself in the position of risk.") As shown in the photograph below, the shield was heavily scratched on the visor part, which impaired Sgt. Jevric's ability to see through it and required him to pull down his shield (further exposing himself to gunfire) to gain additional visibility:[4]



---

[4] MPD ballistic shields now have lights on them, which did not exist at the time of the incident.

*See* Gov't Sent. Mem., Ex 2 (D.E. 31-2).

As shown in GJ-Ex. 2, as presented to the grand jury, Sgt. Jevric had a split second to determine what Mr. Gilmore had his right hand clenched around, while his left hand was near the steering wheel:



GX Ex. CK-2.[5] Sgt. Jevric, believing he saw a firearm, fired as Mr. Gilmore's vehicle sped away toward the police cruisers (identified by blue arrow below) that Sgt. Jevic believed were occupied by officers:

---

[5] A copy of this video will be provided to the Court in advance of sentencing. Throughout his sentencing memorandum, Sgt. Jevric references several of the sixteen grand jury transcripts in this case. To the extent contested by the Government, copies of those transcripts will be provided to the Court at sentencing. The Government only provided the Court the transcript of MPD Sgt. John Aceto, the Government's use of force expert before the grand jury, who was not present at the scene. *See* Gov't Under Seal Ex. A. As discussed herein, Sgt. Aceto's testimony contains several factual errors. For example, (i) the policy regarding barricades did not come into effect until *after* the incident in question and not before; (ii) a firearm does not need to be pointed at a police officer before an officer can use deadly force, rather, any observation of the firearm about to be used as a weapon justifies an officer to use deadly force; and (iii) no specific training was in place to deal with the situation faced by Sgt. Jevic and his fellow officers.



Once Mr. Gilmore's vehicle stopped, MPD officers immediately rendered aid to Mr. Gilmore.

At the time of the event, there was no MPD policy in place to deal with locked vehicles with armed individuals. After this event, MPD issued EO-21-33 (*see* Ex. 7), which provides guidance to officers for dealing with barricade situations, where a subject is armed, barricaded in, and unresponsive to police commands. The executive order requires the deployment of an Emergency Response Team, akin to a swat level team of MPD officers who are trained on special tactics. *Id.* This policy was not in place until December 30, 2021. *Id.* MPD officer witnesses in the grand jury also confirmed that MPD policy prohibited the blocking of the vehicle with other police cars. *See*, *e.g.*, Cote Feb. 4, 2022 GJ Tr. at 51.

Moreover, as further confirmed by officers on scene on August 25, 2021, officers received insufficient training for this type of situation. *See* Ex. 2 at 2 (attesting to "no training for [a] situation such as this"); Salsburg Jan. 21, 2022 GJ Tr. at 57:13-16 (**Q.** "[D]o you receive any training on how officers should position themselves to get someone who's armed out of the vehicle safely? **A.** I mean there's no specific training . . .").[6]

---

[6] In its sentencing memorandum, the Government repeatedly emphasizes that no other officer discharged their firearm and no other officer testified that there was a basis to use deadly force.

As part of the Government's investigation, it subpoenaed law enforcement officer communications with Sgt. Jevric around the time of the shooting. There was no evidence of any obstruction, conspiracy, cover up, or inappropriate comments about the event or the decedent; rather, there was nothing but encouragement and support for Sgt. Jevric knowing that he was distraught after taking another life. *See*, *e.g.*, Sandula Jan. 21, 2022 GJ Tr. at 55 ("Thinking of you . . . Hope you're okay today."); *id.* at 56 ("[D]on't be worried about us. We are worried about you."); Keefe Mar. 2, 2023 GJ Tr. at 6:11-23 ("**Q.** So as part of this investigation, did you learn that some officers who were on scene for the shooting that night had exchanged text messages with Sergeant Jevric after the shooting? . . . **A.** Generally speaking, the messages to Sergeant Jevric in the aftermath were about general moral support to him and just wishing him well for his health and kind of well-being.").

## ARGUMENT

### I.    The Sentencing Guidelines, Statutory Factors, and Other Considerations Support a Sentence Below the Guidelines.

The sentencing factors of 18 U.S.C. § 3553 require this Court to formulate a sentence which is sufficient to accomplish the purposes of sentencing (as addressed below). Accordingly, so long as this Court determines Sgt. Jevric's sentence is sufficient as to him, it is appropriate for purposes of 18 U.S.C. § 3553(a) and takes its appropriate place in the grand scheme of the criminal justice system.

Sgt. Jevric respectfully requests that the Court vary downward from the United States

---

No other officer could see inside the vehicle at that time because it was Sgt. Jevric who got within feet to get the best view of Mr. Gilmore's actions inside the vehicle and officers are trained to only discharge their weapon when they themselves independently see a basis to use deadly force that would not put civilians or other officers in danger of crossfire. Officers do not fire just because another officer fires, especially, when the officer who is discharging his firearm is in the best position to assess the situation.

Sentencing Guidelines ("USSG" or "Guidelines") and, pursuant to 18 U.S.C. § 3553(a), impose a total sentence of three years of supervised release, to include home confinement, community service, and mental health treatment, which would constitute a sentence that is more than sufficient to comply with the purposes of sentencing under the statute.

A.      **Statutory Framework and Required *Mens Rea*.**

Sgt. Jevric faces sentencing on two offenses for which the parties jointly request concurrent sentences: Involuntary Manslaughter, in violation of D.C. Code § 22-2105, and Deprivation of Rights Under Color of Law Resulting in Death, in violation of 18 U.S.C. § 242. Involuntary Manslaughter is "negligence" manslaughter, where the conduct constitutes a "gross deviation for a reasonable standard care" and is based on conduct that "create[s] an extreme risk of death or serious bodily injury." *See* Criminal Jury Instructions for the District of Columbia ("the Redbook"), Instruction 4.212-B. The offense reads in civil tort language because it does not require nor contemplate intent or malice by the person committing the offense.

For the charged civil rights offense under 18 U.S.C. § 242, as the Supreme Court has explained, and courts in the civil rights context have recently confirmed, willfulness requires proof "that the defendant acted with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 191-92, 196 (1998). *See also, e.g.*, *United States v. Andra Vance*, 19-cr-251 (RDM), Jury Instr. at 33 (D.E. 151) (applying definition in § 242 prosecution); *United States v. Jacob Brown*, No. 3:21-cr-00238-TAD-KDM (W.D. La.), Jury Instr. at 11 (D.E. 110) (same); 70 DOJ J. FED. L. & PRAC., no. 2 (March 2022) at 29 (same); Fifth Circuit Criminal Pattern Jury Instruction 2.12, at 123 (https://www.lb5.uscourts.gov/viewer/?/juryinstructions/Fifth/crim2019.pdf, last visited August 1, 2024) ("That the defendant acted willfully, that is, that the defendant committed such act or acts with a bad purpose to disobey or disregard the law, specifically intending to deprive

the person of that right[.]"); Eighth Circuit Model Jury Instruction No. 6.18.242 (2023 ed.), at 208 (https://juryinstructions.ca8.uscourts.gov/instructions/criminal/Criminal-Jury-Instructions.pdf, last visited August 1, 2024) ("[T]he defendant acted willfully, that is, the defendant committed such act or acts with a bad purpose or improper motive to disobey or disregard the law, specifically intending to deprive the person of that right[.]"). [7]

In *Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007), the Supreme Court again made clear that there is a difference between willfulness in the civil context, which can be based on reckless conduct, and the term "willfulness" as used in the criminal context:

> It is different in the criminal law. When the term 'willful' or 'willfully' has been used in a criminal statute, we have regularly read the modifier as limiting liability to knowing violations. This reading of the term, however, is tailored to the criminal law, where it is characteristically used to require a criminal intent beyond the purpose otherwise required for guilt, or an additional 'bad purpose,' or specific intent to violate a known legal duty created by highly technical statutes.

*Id.* at 57-58, n.9.

This strict interpretation has been followed by federal courts and acknowledged and promogulated by the Department of Justice as the correct legal standard. *See* DOJ Civil Rights Division, https://www.justice.gov/crt/law-enforcement-misconduct, last visited August 1, 2024 ("Therefore, even if the government can prove beyond a reasonable doubt that an individual's Constitutional right was violated, § 242 requires that the government prove that the law

---

[7] *See also United States v. Hitselberger*, 991 F. Supp. 2d 101, 108 (D.D.C. 2013) (citing *Bryan*, 524 U.S. at 190) ("Thus, the core of 'willful' misconduct is to act with the knowledge or intent to disregard the law[.]"); *United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020) ("As a general matter, a person who acts willfully need not be aware of the specific law that his conduct may be violating. Rather, knowledge that the conduct is unlawful is all that is required" (citation and punctuation omitted)); *United States v. Garza*, 754 F.2d 1202, 1210 (5th Cir. 1985) (instructing, in a § 242 prosecution, that "[t]he word 'willfully,' as that term has been used from time to time in these instructions means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids[;] [t]hat is to say, with a bad purpose either to disobey or to disregard the law").

enforcement officer intended to engage in the unlawful conduct and that he/she did so knowing that it was wrong or unlawful. *See Screws v. United States*, 325 U.S. 91, 101-107 (1945). Mistake, fear, misperception, or even poor judgment does not constitute willful conduct prosecutable under the statute.").

This high standard for criminal prosecutions, unlike in the civil § 1983 context, led the Congressional Research Service to conclude that: "[p]erhaps the greatest hurdle to successful prosecutions under Section 242 is its specific intent element." Congressional Research Service, *Police Use of Force: Rules, Remedies, and Reforms* at 14 (Oct. 30, 2015), www.everycrsreport.com/files/20151030_R44256_f6c3152f4734c1fb057a8d1bb8fe2639fcb3e94 f.pdf, last visited August 1, 2024. In fact, prior to very recent years, "DOJ has declined to prosecute Section 242 cases at an extremely high rate, with 'lack of criminal intent' being one of the primary reasons." *Id.* (citation omitted).

The jurisprudence on the issue of willfulness, while at a crossroads, nonetheless permits the entry of a guilty plea in this case based on the still existing D.C. Circuit precedent that interprets willfulness to include recklessness. *See United States v. Ehrlichman*, 546 F.2d 910, 921 (D.C. Cir. 1976) (instructing that "even if the defendant did not in fact recognize the unconstitutionality of his act," he can be found "to have acted 'willfully,' *i.e.*, 'in *reckless disregard* of constitutional prohibitions or guarantees'" (emphasis added)).

Sgt. Jevric brings this to the Court's attention not to challenge his guilty plea, but to clearly note that reckless conduct is treated and punished differently than deliberate and intentional conduct. Here, consistent with the companion involuntary manslaughter conviction, Sgt. Jevric's conduct should be treated as non-intentional conduct, warranting a different sentence than individuals who intended to violate an individual's constitutional rights and knew their actions

were unlawful when taking such actions.[8]

## B.    Sentencing Discretion and § 3553 Statutory Factors.

In accordance with 18 U.S.C. § 3553(a), this Court is required to impose a sentence that is sufficient, but not greater than necessary to comply with the purposes of the statute, which includes the need for the sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training.

The Sentencing Guidelines are only advisory despite their mandatory language. *See United States v. Booker*, 543 U.S. 220, 245 (2005). A district court must therefore "consider Guidelines ranges," but is permitted "to tailor the sentence in light of other statutory concerns as well." *Id.* The Supreme Court in *Gall v. United States* outlined the process to follow:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, *after giving both parties an opportunity to argue for whatever sentence they deem appropriate*, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so

---

[8] Remarkably, the Government claims that by arguing that he did not invite the dangerous situation presented to him by the events undertaken by Mr. Gilmore, Sgt. Jevric is somehow undermining his acceptance of responsibility. That claim is without merit. As an initial matter, the Government permitted Sgt. Jevric to acknowledge his unintentional conduct that deviated from the standard of care and, when doing so, knew that the guidelines for such an offense was appropriately lower for non-intentional conduct than for conduct done intentionally. By refusing to allow Sgt. Jevric to explain the circumstances that led to his actions (as requested by this Court in its April 2, 2024 Minute Order) while analogizing his conduct to the officers in the George Floyd case, it is the Government that is potentially breaching the plea agreement in this case. *See, e.g.*, *United States v. Yavier Mojica-Ramos*, 103 F.4th 844, 850 (1st Cir. 2024) (recognizing that the government "technically complied with the [plea] agreement by recommending a within-guidelines sentence," at the top of the guidelines, but declining to "validate the government's overall conduct as 'reasonably consistent with making such a recommendation, rather than the reverse'" (citation omitted)).

doing, he *may not presume that the Guidelines range is reasonable*. He must make an individualized assessment based on the facts presented.

552 U.S. 38, 49-50 (2007) (emphasis added) (citations and punctuation omitted).

Thus, in fashioning an appropriate sentence, this Court must consider the Guidelines along with the other factors set forth in 18 U.S.C. § 3553(a) (*see, e.g.*, *Booker*, 543 U.S. at 260; U.S. Sentencing Comm'n, Guidelines Manual (2023)) and treat the Guidelines "as one factor among several" that § 3553(a) requires courts to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

Under 18 U.S.C § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence." Further, under 18 U.S.C. § 3582(a), the court, in considering the factors in § 3553(a) and their applicability, should recognize "*that imprisonment is not an appropriate means of promoting correction and rehabilitation*" (emphasis added).

Although the guidelines range will generally align with the objectives of the § 3553(a) factors, that is not always the case. As the Supreme Court said in *Kimbrough*:

> [I]n the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives. *The sentencing judge, on the other hand, has greater familiarity with the individual case and the individual defendant before him than the Commission or the appeals court. He is therefore in a superior position to find facts and judge their import under § 3553(a) in each particular case.* In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply.

552 U.S. at 109 (emphasis added) (citations and punctuation omitted).

As one district court has framed it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." *See* Terry Carter, *Rakoff's Stance on the SEC Draws Fire, Praise—and Change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

### C.     Applicable Sentencing Guidelines Range.

Sgt. Jevric's criminal history score is zero, placing him in Criminal History Category I. The parties agree with the sentencing calculations for both offenses and that the sentences should be imposed concurrently. Sgt. Jevric is not entitled to a zero-history score offender reduction given that his conduct resulted in death and because he is a police officer, and where the statute specifically prohibits reductions for civil rights offenses. Although Sgt. Jevric's acceptance of responsibility is reflected in the calculation of his Guidelines for his federal offense of conviction, acceptance does not reduce the applicable Guidelines for the D.C. offense, thereby awarding him no benefit for pleading guilty, a factor relevant to this Court's analysis as to why he should not receive a sentence at the top of the Guidelines as the Government seeks in this case.

### D.     A Below-Guidelines Sentence is Appropriate in This Case.

District courts may impose a sentence below the Guidelines range through either a "departure" or a "variance." *See United States v. McKinnie*, 21 F.4th 283, 289 (4th Cir. 2021). "A 'departure' is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves." *United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) (citation omitted). "It is frequently "triggered by a prosecution request to reward cooperation . . . or by other factors that take the case 'outside the heartland' contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense." *Id.* (citation omitted). "A 'variance,' by contrast, occurs when a judge imposes a sentence above or below the otherwise

properly calculated final sentencing range based on application of the other statutory factors in 18

U.S.C. § 3553(a)." *Id.* (citation omitted); *see also* USSG § 1B1.1(c).

Pursuant to 18 U.S.C. § 3553 (and specifically those portions of it that are applicable to

this sentence), in imposing a sentence that is sufficient but not greater than necessary to comply

with the purposes of sentencing, this Court is to consider the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of
the defendant;

(2) the need for the sentence imposed —

    (A)    to reflect the seriousness of the offense, to promote respect for the
law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational
training, medical care, or other correctional treatment in the most
effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

    (A)    the applicable category of offense committed by the applicable
category of defendant as set forth in the guidelines—

*     *     *

(6)    the need to avoid unwarranted sentence disparities among defendants with
similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

Here, Sgt. Jevric should receive a variance from the Guidelines, as the applicable § 3553(a)

sentencing factors support the defense's recommended sentence in this case. While Sgt. Jevric is

precluded from allocuting for a departure under the Guidelines pursuant to the terms of his plea

agreement, the rationale for certain departures is persuasive as to why Sgt. Jevric is entitled to a downward *variance*.[9]

### 1.    The Nature and Circumstances of the Offense.

No one can diminish the terrible loss of life that occurred in this case. That result is significant and tragic, while the circumstances that led to that outcome are complex. Notably, in this case, Sgt. Jevric did not intend to unlawfully take the life of another person and he and his fellow officers made numerous attempts to avoid any injury to Mr. Gilmore and to themselves.

Sgt. Jevric and officers responded to an extremely dangerous situation on August 25, 2021. This situation was not created by MPD officers, but by Mr. Gilmore. He was in possession of a loaded firearm (as a convicted felon), actively operating his BMW in an intersection while under the influence (*see* Gov't Under Seal Ex. B at 11) and was the subject of an outstanding arrest warrant for a felony crime of violence, when looking at officers and deciding to flee the scene. While Mr. Gilmore's loss of life is undeniably tragic, Sgt. Jevric did not wake up on that day intending to abuse his police power, to hurt or injure anyone, or to send a message, nor were his

---

[9] As part of evaluating what sentence to render in this case, there is an obligation upon the Court to independently identify and evaluate any and all applicable departures regardless of whether either party advocates for a departure or not. *See*, *e.g.*, USSG §1B1.1(a)–(c) (instructing that courts shall first determine the guideline range, then consider the departure policy statements, then consider the 18 U.S.C. § 3553(a) factors as a whole); *United States v. Lozoya*, 623 F.3d 624, 625 (8th Cir. 2010) (district courts "should decide if any applicable [g]uidelines provisions permits a traditional 'departure' from the recommended sentencing range"); *United States v. Martinez-Barragan*, 545 F.3d 894, 900 (10th Cir. 2008) ("One step in applying the [g]uidelines is to determine whether or not to depart from the range specified in the Sentencing Table."); *United States v. McBride*, 434 F.3d 470, 477 (6th Cir. 2006) (guideline departures are still a relevant consideration for determining the appropriate guideline sentence); *United States v. Jordi*, 418 F.3d 1212, 1215 (11th Cir. 2005) ("[T]he application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered."); *United States v. Selioutsky*, 409 F.3d 114, 117-18 (2d Cir. 2005) (A "sentencing judge must consider the factors set forth in 18 U.S.C. § 3553(a), including the applicable Guideline range and available departure authority" (citations omitted)).

actions a product of racism or hatred. Instead, he simply wanted to protect his community and his fellow officers.

As discussed by *everyone* in this case, there was no perfect strategy to resolve this dangerous situation. It was difficult, it was extremely challenging, and Sgt. Jevric's willingness to bear the responsibility means that he now deals with the consequences of his split-second decision and, make no mistake, his decision making analysis was deficient.[10] Regardless of Sgt. Jevric's motivation or his belief that Mr. Gilmore posed a danger to fellow officers in cruisers, the continuous shooting of an armed individual as he was driving away was reckless. This enormous pressure and challenges, nonetheless, mitigate against a lengthy period of incarceration in this case. *See*, *e.g.*, *Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation."); *id.* at 397 (cautioning against the 20/20 vision of hindsight when evaluating an officer's use of force).

In the scale of civil rights prosecutions in this country, from the beating of Rodney King to the murder of George Floyd, the nature and circumstances of this case are more aligned with cases where the Department of Justice declined prosecutions, instead relying on traditional remedies of administrative punishment, civil liability, and consent decrees for more training of officers (as was previously done with MPD years earlier).

---

[10] Sgt. Jevric undertook this assignment even when there were "two sergeants" on scene and the "watch commander." Hawkins Nov. 12, 2021 GJ Tr. at 44: 22-25; *accord* Lee Nov. 12, 2021 GJ Tr. at 22:17-19 ("Yes, there were other supervisors too. The watch commander also responded to that location, somebody higher than Sergeant Jevric's rank."). At no time, did anyone on scene (including supervisors) contemporaneously disagree with the tactical approach Sgt. Jevric undertook during the highly fluid and dangerous situation.

### 2.      Defendant's History and Characteristics.

Sgt. Jevric is a well-respected law enforcement officer and public servant who immigrated to this country to avoid genocide and served for fourteen years without a sustained finding of excessive force prior to the event at issue. *See* Exs. 1-6. He defended the U.S. Capitol at its darkest hour and assisted numerous citizens throughout his career, some recognized by MPD and some only known to Sgt. Jevric himself. *See id.*

Sgt. Jevric suffers from PTSD and vestibular and neurological symptoms related to a complex medical history of chronic cholesteatoma and ear infections, requiring him to undergo multiple surgeries and causing significant impairment of hearing and other cognitive issues. *See* PSR, ¶ 74; *see also* https://theearinstitute.com/ear-hearing/hearing-loss-dementia/, last visited August 1, 2024 (attesting to "an irrefutable link between hearing loss and cognitive decline"). Dr. Anderson opined that Sgt. Jevric's ability to perform his duties in potentially life-threatening circumstances was seriously compromised and that his ability to respond in life-threatening encounters may have been hampered by his serious medical impairments. PSR, ¶ 74.

Separate and apart from his medical and mental health challenges, in excessive use of force cases, the Guidelines do not account for the unique susceptibility to abuse that police officers undoubtedly face when forced to reside with a group of inmates who feel personally victimized by police officers in general. Courts have found reductions in the Guidelines to be appropriate for those who will be treated more harshly in prison for being a police officer because abuse in prison is not part of an appropriate sentence. *See, e.g.*, *United States v. Shasky*, 939 F. Supp. 695, 701 (D. Neb. 1996); *Koon v. United States*, 518 U.S. 81, 116 (1996).

The media coverage in this case and the protests that followed (fueled in large part by the media omitting that Mr. Gilmore had a firearm on his person at the time of the incident and instead

alleging that he was shot when he was sleeping or just driving home) led to outrage against Sgt. Jevric, anger towards the Government for the (mistaken) belief that Sgt. Jevic was not being treated harshly enough, claims that Sgt. Jevric should receive a year for every bullet he discharged, and claims that *the streets* would take care of Sgt. Jevic for his actions.

  

The extensive press coverage further ensures that other inmates will certainly be aware of Sgt. Jevric's status as a former police officer, making him vulnerable to abuse.[11] It is certainly not difficult for other inmates to find out his former occupation and, in this case, it is inevitable.[12]

Additionally, the physical and mental condition of Sgt. Jevric is relevant when evaluating his ability to defend himself in prison, while already being in a vulnerable state given his former employment. For these reasons, a variance under the Guidelines is appropriate in this case.

---

[11] *See*, *e.g.*, https://www.nytimes.com/2023/03/08/us/dc-officer-shooting-murder-charges.html, last visited August 1, 2024; https://www.yahoo.com/news/dc-officer-pleads-guilty-fatally-202723137.html, last visited August 1, 2024, https://www.washingtonpost.com/dc-md-va/2024/02/23/dc-police-antwan-gilmore-shooting-manslaughter-plea/, last visited August 1, 2024; https://wtop.com/dc/2024/02/dc-police-sergeant-pleads-guilty-to-federal-civil-rights-violation-in-fatal-shooting-of-man-sleeping-in-car/, last visited August 1, 2024; https://www.cbsnews.com/news/officer-enis-jevric-charged-murder-dc-death-antwan-gilmore-asleep-car/, last visited August 1, 2024.

[12] The defense, having no intention to discuss Mr. Gilmore's history with law enforcement any further than necessary to provide context to the events at issue, directs the Court to paragraph 153 of the PSR, which further illuminates the concerns surrounding a sentence of incarceration for Sgt. Jevric and any detention in the D.C. Jail pending designation to the Federal Bureau of Prisons.

     3.     **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

For someone like Sgt. Jevric, who was respected among his family and members of the community for his service to the District, the humiliation and embarrassment that he has experienced as a result of losing his career and being convicted adequately reflects the seriousness of the offense. He is also now a felon at the age of forty-two and will never be able to possess a firearm, vote, or serve on a jury, let alone, continue to serve his community. He will be on supervision for a significant period of time, and, if sentenced to incarceration, he could be assaulted because of his status as a police officer and, given his current physical and mental health limitations, would not be able to adequately defend himself.

As other judges in this District have recognized, there are many other ways an individual can be punished besides jail time:

> People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.

*See United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 29.

Moreover, probation is not an inadequate punishment. As the Supreme Court has explained:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probations are also subject to individual special conditions imposed by the court.

*Gall v. United States*, 552 U.S. 38, 48-49 (2007) (footnote omitted). Here, the interests of justice are best served by a non-incarceration sentence.

    **4.    Adequate Deterrence (Specific and General).**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. *See* 18 U.S.C. § 3553(a)(2)(B)–(C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). Specific deterrence is obtained for the defendant by the prosecution and conviction itself. The personal and reputational consequences Sgt. Jevric has suffered, and the consequences of now being a convicted felon, are more than sufficient to discourage him from engaging in similar conduct.

Furthermore, Sgt. Jevric will never again serve as a police officer and so any need to protect the community is a moot point given the fact that the offense arose because of his employment as a police officer. The facts that Sgt. Jevric immigrated to this country and gave back to the country by serving the citizens of the District for fourteen years, and that he has been a mentor to others in their careers in law enforcement, further show how his entire life has been one of service. *See* Exs. 1-6. The Government may characterize Sgt. Jevric as a poor or deficient officer, but the Government has never responded to thousands of calls for service in one of the most dangerous cities in America. Rather, the Government chooses to encapsulate Sgt. Jevric's life based on mere seconds out of fourteen years of otherwise lawful service. Nobody should be judged solely based on the worst moment of their life.

As for general deterrence, the prosecution itself (and the publicity of arrest and conviction) all serve as a significant general deterrence. *See, e.g.*, *Wayte v. United States*, 470 U.S. 598, 607 (1985) (observing that any prosecution has a "general deterrence value"); *United States v.*

*Gamarra*, 940 F.3d 1315, 1321 (D.C. Cir. 2019) (observing that prosecution itself provides general deterrence). Additionally, a period of incarceration is not the way to serve the goal of general deterrence. Empirical evidence proves that the certainty and swiftness of prosecution, rather than the severity of the punishment, is the greater deterrent.[13] This is especially true in cases like this where a police officer who has no criminal history is charged. The fact that a police officer's career is ended is more than enough to send the message to other police officers around the country who, similar to Sgt. Jevric, value their careers and have worked very hard to be successful in their lives. Accordingly, the termination of employment and subsequent federal prosecution on manslaughter for reckless and non-intentional conduct is sufficient general deterrence.

Lastly, individuals with no criminal history are far less likely to recidivate. In fact, a study done by the U.S. Sentencing Commission, which obtained data on a large group of defendants released in 2010, confirmed that individuals in criminal history category one had the lowest rearrest rates (30.2%) and offenders in criminal history category six had the highest rearrest rates (76.2%).[14] Similarly, older individuals have a much lower recidivism rate. *See* U.S. Sentencing Commission, https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders, last visited August 1, 2024. This analysis was also the motivation for the U.S. Sentencing Commission recently adopting the zero criminal history score offender reduction to the Guidelines, which Sgt. Jevric cannot unfortunately benefit from in this case.

---

[13] *See* National Institute of Justice, Five Things About Deterrence (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence, last visited August 1, 2024.

[14] *See* United States Sentencing Commission, Recidivism of Federal Offenders Released in 2010 (September 20, 2021), available at https://www.ussc.gov/research/researchreports/recidivism-federal-offenders-released-2010, last visited August 1, 2024.

Regardless, there can be no serious challenge to the fact that Sgt. Jevric presents no risk of recidivism, as evidenced by the Government's willingness to permit Sgt. Jevric to remain in the community for over two years and even after his guilty plea in this case. Sgt. Jevric has also shown since this incident that he can adhere to his conditions of release, not reoffend, and be a lawful citizen in the remaining years of his life, even as a convicted felon.

###    5.    Kinds of Sentences Available.

A sentence of incarceration is not always necessary to satisfy Congress' sentencing mandate. Indeed, as observed by the district court in the Supreme Court's decision in *Gall v. United States*, probation (or post-release supervision), "rather than an act of leniency, is a substantial restriction of freedom." 552 U.S. 38, 44 (2007) (punctuation omitted). The *Gall* Court emphasized that the defendant would have to "comply with strict reporting conditions." *Id.* The Court also noted that the defendant would "not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court." *Id.*

This Court may also consider a sentence with a period of home detention, which has been defined by the Guidelines as:

> [A] program of confinement and supervision that restricts the defendant to his place of residence continuously, except for authorized absences, enforced by appropriate means of surveillance by the probation office. When an order of home detention is imposed, the defendant is required to be in his place of residence at all times except for approved absences for gainful employment, community service, religious services, medical care, education or training programs, and such other times as may be specifically authorized. Electronic monitoring is an appropriate means of surveillance and ordinarily should be used in connection with home detention. However, alternative means of surveillance may be used so long as they are as effective as electronic monitoring.

USSG § 5F1.2, Commentary, n.1.

Based upon the information contained in this submission and given the mandate of 18 U.S.C. § 3553(a)(3) for the Court to consider "the kinds of sentences available," a community service order would also satisfy the goals of sentencing. A 2001 publication of the Administrative Office of the United States Courts described community service as "a flexible, personalized, and humane sanction," and "offers a way for the offender to repay or restore the community." Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service, Office of Probation and Pretrial Services, Administrative Office of the U.S. Court (Feb. 2001), available at https://www.nhp.uscourts.gov/sites/nhp/files/ccservice.pdf, last visited August 1, 2024. It is "practical, cost-effective, and fair — a 'win-win' proposition for everyone involved." *Id.* It is also recognized that "[c]ommunity service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation. . . . It restricts offenders' personal liberty[,] . . . allows offenders to atone or 'make the victim whole' in a constructive way[, and] . . . may be regarded as . . . a form of symbolic restitution when the community is the victim." *Id.* In selecting an appropriate candidate to perform community service, United States Probation recommends as follows:

> Courts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service. . . . Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.

*Id.*

As discussed below, Sgt. Jevric requests a sentence of three years of supervised release. This Court could also impose a requirement of community service and home confinement in lieu of incarceration so that Sgt. Jevric can repay the community for the actions that led to his prosecution in this case.

### 6.      The Need to Avoid Unwarranted Sentencing Disparities.

The need to avoid unwanted sentencing disparities clearly weighs in favor of a downward variance in this case.

What is most inexcusable about the Government's recommendation is a complete lack of regard for this factor, which essentially sends an even more powerful and disturbing message — that Sgt. Jevric should be treated more harshly than the police officers who beat and mocked Rodney King or who engaged in conduct that led to the death of George Floyd. The analysis below discusses these cases as well as many others that highlight the importance of this factor for Sgt. Jevric and supports a much lower sentence in this case.

#### *United States v. Koon*, No. 2:92-cr-686 (JGD) (C.D. Cal.)

After the controversial beating of Rodney King by police officers from the Los Angeles Police Department ("LAPD"), the district court (even after remand in *Koon v. United States*, 518 U.S. 81 (1996)) imposed a sentence of 30 months' incarceration for one of the defendants, Stacey Koon, who was convicted under 18 U.S.C. § 242. Koon was convicted as the sergeant in charge among his fellow officers who struck King in the head and his lower extremities and chest repeatedly. Then, for 1 minute and 15 seconds, Koon watched as his fellow officers stomped on King and kicked him six times. After this beating, officers stood by and said, "Haven't beat up someone that bad in a long time . . . we played a little ball tonight didn't we." The LAPD through its investigation found that between Koon and his fellow officers, Rodney King was struck between 53 and 56 times. What was so significant about the King beating that is not present in this case is how officers continued to deliver brutal strikes to King even after they gained his compliance and after he was handcuffed on the ground.

The district court also sentenced Koon's fellow officer, Laurence Powell, to 30 months'

incarceration, departing downwards significantly from a guidelines range of 70-87 months. The stark contrast between the *Koon* case and this matter is compelling. Here, by comparison, Sgt. Jevric's conduct was not intentional and was not undertaken to punish Mr. Gilmore, nor was it a product of any hatred or bias.

### United States v. Barnes, 890 F.3d 910 (10th Cir. 2018)

The district court varied downward from a guidelines range of 70-87 months by imposing a sentence of 24 months' incarceration after Raymond Barnes, a jail superintendent, assaulted inmates who were restrained and compliant and ordered other jail employees to do so as well. These premeditated "Meet and Greets" were orchestrated on a regular basis under the guise of maintaining control but resulted in blatant abuse of inmates and an atmosphere among other employees that promoted gratuitous violence. When comparing this case to the instant matter, Sgt. Jevric's conduct was not premeditated and was not intended to be cruel or to promote a culture of violence. Sgt. Jevric actions were reckless, but not intentional or malicious, and were made in a highly complex and dangerous situation involving an individual in possession of a firearm.

### United States v. Harris, 293 F.3d 863 (5th Cir. 2002)

The district court imposed a sentence of 15 months' incarceration — varying downward from a guidelines range of 87-108 months. The defendant officer, Charles Harris, was convicted for excessive use of force on a detainee who was already restrained in a police car with plexiglass separating Harris and the detainee. In response to this detainee throwing his body around in the back of the police car, Harris took his baton and struck the detainee in the head and face. The victim's injuries resulted in two separate injuries to the head, one being a laceration and the other being a hematoma. There was no immediate threat or danger to the officer or the community — other than a threat the detainee may have posed to himself. Again, courts routinely vary down from

the Guidelines, even for offenses that are intentional and the product of malice, unlike the circumstances facing this Court in this case.

### *State of California v. Mehserle* (Alameda County, 2009)

Former police officer Johannes Mehserle was convicted of involuntary manslaughter and sentenced to two years' imprisonment after shooting an unarmed man who was lying face down while being handcuffed in the back.[15] Mehserle claimed at trial that he did not intentionally use a gun and intended to reach for his taser; however, a jury found that he did intentionally use a gun. This is just one example among many other deaths that have resulted from the hands of police officers whose sentences came nowhere near what the Government is asking the Court to impose in this case.

### *United States v. Henderson*, 211 F. App'x 919 (11th Cir. 2006)

The district court sentenced former officer Wyatt Henderson to 27 months' incarceration with a guidelines range of 87-108 months, after he was convicted for striking a victim in the face with his revolver while the victim was lying on the ground offering no resistance. When Henderson was instructed to file a use of force report, he threw his cellular phone across the room and said, "Jesus Christ, you can't pistol-whip anybody anymore." As a result of the assault, the victim suffered a fractured jaw. Henderson's sentence is far less than half of what the Government is seeking in this case for non-intentional conduct.

### *Flythe v. D.C.*, 791 F.3d 13 (D.C. Cir. 2015)

In *Flythe*, Betty Flythe filed a civil lawsuit under 42 U.S.C. § 1983 after two police officers shot and killed her son, Tremayne Flythe. After a six-day trial against former officer Angel

---

[15] *See* Article, https://www.latimes.com/archives/la-xpm-2010-nov-06-la-me-bart-cop-sentence-20101106-story.html, last visited August 1, 2024.

Vasquez, the jury found him liable for assault and awarded Ms. Flythe $187,300 in compensatory damages. The jury ended up finding fault because several witnesses at trial contradicted the officers' testimony, three of them saying that Eagan chased Mr. Flythe while firing his weapon — which supported the physical ballistic evidence in the case. Despite this finding, the Government did not pursue criminal charges against these officers.

### *State v. Noor*, 964 N.W. 2d 424 (Minn. 2021)

Mohamed Noor was prosecuted by the State of Minnesota and not the Department of Justice. Noor shot and killed a woman because of an unsubstantiated suspicion that he was being ambushed in his car. Noor was sentenced to four years and nine months for *manslaughter* — which is a sentence that is lower than what the Government is seeking in this case. Indeed, the *maximum* sentence for a federal involuntary manslaughter conviction is eight years, 18 U.S.C. § 1112, which is only slightly more than the Government seeks in this case.

### *K.J.P. v. Cnty. of San Diego*, No. 3:15-cv-02692-H-MDD (S.D. Cal.)

Lucky Phounsy was having a mental health crisis and called 911. San Diego police officers responded. After an altercation between Phounsy and two officers, Phounsy was tased multiple times, punched, handcuffed, put in maximum restraints, strapped to a gurney, and had prolonged pressure applied to his head and torso. Phounsy was in a coma for several days when his family made the decision to remove him from life support. The family sued pursuant to 42 U.S.C. § 1983 and the jury found in the family's favor — awarding them 85 million dollars. Neither of the officers were charged criminally.

### *State of Tennessee v. Andrew Delke* (2018)

Former Nashville police officer Andrew Delke pleaded guilty to manslaughter and was sentenced to three years of incarceration after shooting Daniel Hambrick in the back three times

as Hambrick ran away after a traffic stop on July 26, 2018.[16] Clearly, the Government cannot realistically argue that Sgt. Jevric should be incarcerated longer when Mr. Gilmore had a weapon on his person when encountered by law enforcement, thereby creating a clear danger to all individuals present at the scene.

### State of Pennsylvania v. Brian Devaney, et al. (Delaware County, May 5, 2023)

Three former Pennsylvania police officers were sentenced to probation in connection with the 2021 shooting death of an eight-year-old girl as she left a high school football game with her family in a Philadelphia suburb.[17] If officers were reckless in their actions that resulted in death, yet received probation, how can Sgt. Jevric be incarcerated for recklessly engaging in conduct with an individual who was visibly in possession of a weapon and was attempting to flee the scene.

### State of Ohio v. Cecil Morrison (Athens County, March 31, 2022)

When former police officer Cecil Morrison attempted to effectuate a traffic stop and was yelling at the driver to get out of the car, the driver instead backed up and ran into a police cruiser that was partially blocking the driveway. As Morrison continued to order the driver out of the car, the driver twice pulled forward and back again to clear the cruiser. Once the driver got his car out, Morrison opened fired and shattered the driver's side front and rear windows. The driver was killed. The driver's child was sitting in a car seat in the back of the car on the passenger side, but was unharmed.[18] Morrison received a sentence of probation and was ordered as part of his plea

---

[16] *See* https://www.tennessean.com/story/news/crime/2022/10/27/nashville-officer-andrew-delke-released-charged-fatal-shooting-2018/69596660007/, last visited August 1, 2024.

[17] *See* https://www.cnn.com/2023/05/05/us/fanta-bility-death-officers-sentencing/index.html, last visited August 1, 2024.

[18] *See* https://woub.org/2022/03/31/police-officer-who-killed-nelsonville-man-enters-plea-and-loses-badge/, last visited August 1, 2024.

agreement to permanently surrender his Ohio Peace Officer Training Certificate, which meant he could not be employed in the state of Ohio as a law enforcement officer.

Sgt. Jevric is no longer a police officer and has no ability to commit any further violations of police policy or to reoffend, like former police officer Morrison. If incarceration was unwarranted in Morrison's case, it is clearly not warranted in this case.

### State of Maryland v. Darryl Wormuth (P.G. County, May 30, 2023)

Former police officer Darryl Wormuth was sentenced to only 45 days in jail after being convicted of assaulting Kayvon Hines. Wormuth struck the seventeen-year-old Hines, who was already handcuffed, in the throat, while essentially bragging about what he had done. Wormuth subsequently sent racially charged private text messages regarding Hines. Wormuth was not charged with a federal civil rights color of law violation and, at sentencing, the prosecution asked for one year in jail.[19] In this case, Sgt. Jevric's conduct was not racially motivated and, although Sgt. Jevric's actions tragically resulted in death, the effect was not intentional, but the product of a rushed and reckless decision.

### State of Minnesota v. Kim Potter (February 18, 2022)

Kim Potter, the former police officer convicted of manslaughter in the death of Daunte Wright, was sentenced to two years of incarceration, and will serve only 16 months in prison, with the remainder on supervised release. The sentence was lower than Minnesota's recommended sentencing guidelines — roughly seven years for first-degree manslaughter. Potter shot and killed Wright by using her firearm instead of her Taser when multiple officers attempted to extract

---

[19] *See* https://www.wusa9.com/article/news/police/officer-sentenced-for-assaulting-teen-in-2020-traffic-stop-prince-georges-county/65-86e1fc3e-cd01-4986-8f9e-6928184a927a, last visited August 1, 2024; https://www.nbcwashington.com/investigations/prince-georges-police-officer-on-racist-texts-and-retaliation-i-just-felt-betrayed/3399226/, last visited August 1, 2024.

Wright from his vehicle during a traffic stop. In this case, the Government asks this Court to impose a sentence more than three times that of the sentence Officer Potter received.[20]

### State of Colorado v. Randy Roedema (January 5, 2024)

Former police officer Randy Roedema was sentenced to fourteen months of incarceration on the charges of criminally negligent homicide and third-degree assault following the death of 23-year-old Elijah McClain, who was detained while walking home from the grocery store in August 2019, while wearing a ski mask. The interaction led to McClain vomiting into the ski mask. Officers were seen on bodycam video forcibly restraining McClain while paramedics injected him with ketamine. McClain died days later at the hospital and an autopsy found that he had received an overdose of ketamine.[21]

### United States v. Jesse Porter (August 25, 2023)

Jesse Porter, a retired MPD lieutenant, was sentenced to three years of incarceration after pulling out a firearm and shooting an officer in training when the firearm was pointed directly at the trainee as a joke (even though Porter believed it was a training gun that did not contain live ammunition). The discharge of the firearm occurred in a well-lit controlled environment inside a building during daytime. According to the plea agreement, Porter noted that, "[b]ased on the defendant's 33 years as a law enforcement officer, including work at the police academy, the defendant knew that his handling of his firearm – that is, bringing a live firearm into a training environment and in a DC public building, keeping the firearm on his person during non-firearms

---

[20] *See* https://www.npr.org/2022/02/18/1081597518/kim-potter-daunte-wright-sentencing, last visited August 1, 2024.

[21] *See*, *e.g.*, https://www.cpr.org/2024/02/22/elijah-mcclain-randy-roedema-appeal/, last visited August 1, 2024; https://www.cbsnews.com/colorado/news/former-aurora-officer-randy-roedema-sentenced-2019-death-elijah-mcclain/, last visited August 1, 2024.

related training, pointing his orange training gun at the decedent – was at least a gross deviation from the proper safety protocols for safe handling, storage and use of a firearm."

Mr. Gilmore's family lawyer Brian McDaniel, Esq., who is leading the civil rights wrongful death action against Sgt. Jevric, described when previously representing Lieutenant Porter that the incident was "a tragic accident," even though the victim's family in that case, as in this case, called the involuntary manslaughter conduct "murder," the likely sentence a "slap on the wrist," and the process of the case drawn out.[22] Given these circumstance, the assigned judge did not feel that it was appropriate to deviate from the *bottom* of the D.C. guidelines range.

While Sgt. Jevric acknowledged to also engaging in reckless conduct that led to Mr. Gilmore's death, unlike in the case of Lieutenant Porter, Sgt. Jevric, along with other officers, pointed their weapons given the serious danger of an armed individual passed out in an operational vehicle, which is not a joke,[23] but a potential life and death situation.

### *United States v. Andra Vance*, No. 19-cr-251-RDM[24]

On February 16, 2018, Andra Vance, a fifteen-year veteran of the Metro Transit Police ("MTPD"), was assigned to foot patrol at the Anacostia Metro Station, with his partner, MTPD officer David Ulrich. At approximately 8:30 a.m., Darrell Craig used a metro *senior fare* card that did not belong to him. A Washington Metropolitan Area Transit Authority ("WMATA") employee confiscated the fare card from Mr. Craig and he became angry. When Officer Vance stepped in

---

[22]   *See*   https://www.wusa9.com/article/news/local/dc/retired-lieutenant-sentenced-shooting-special-police-officer-death-training-anacostia-library/65-e49ff5fc-2b8f-4e3d-9f5b-1b968b290cef, last visited August 1, 2024.

[23]   *See*   https://www.fox5dc.com/news/former-dc-police-lieutenant-sentenced-to-3-years-for-fatally-shooting-special-police-officer, last visited August 1, 2024.

[24] The factual synopsis contained herein is based on the Government's Sentencing Memorandum in *United States v. Andra Vance*, No. 19-cr-251-RDM (D.E. 175).

and explained to Mr. Craig that he would not be getting the fare card back, Mr. Craig directed his anger toward the officers. This exchange occurred at the locked emergency exit gate, with the officers standing on the paid side and Mr. Craig standing on the unpaid side. Mr. Craig briefly stepped away from the emergency gate, took off his jacket, returned with his fists clenched, shook the locked gate, and continued to demand the fare card. Mr. Craig then put his jacket back on and walked around to the unpaid side of another fare gate.

Officer Vance met Mr. Craig at the gate, extending his metal baton at his side while facing Mr. Craig. Officer Vance pushed through the closed ADA gate that separated him and Mr. Craig and swung his metal baton once, striking Mr. Craig in the head. At the time that Officer Vance struck Mr. Craig, he was backing away from Officer Vance and the fare gate. According to the Government, prior to the initial strike, Mr. Craig "did not lunge at [Officer Vance], spit at [Officer Vance], raise his fists at [Officer Vance], attempt to strike [Officer Vance], strike [Officer Vance], use a weapon against [Officer Vance], or threaten the use of a weapon against [Officer Vance]." Thereafter, Mr. Craig ran out of the metro station and Officer Vance followed closely behind, continuing to swing his metal baton at Mr. Craig's "head and neck area."

Outside the metro station, Officers Vance and Ulrich took Mr. Craig to the ground. According to the Government, Officer Vance used his baton to choke Mr. Craig, who was lying on his back on the pavement while Officer Ulrich attempted to place him into handcuffs. Officer Vance "continued to choke" Mr. Craig as a pool of his "blood began to pool underneath his head." Mr. Craig was turned to his stomach and Officer Vance pressed his baton on the back of Mr. Craig's neck. Officer Ulrich then placed Mr. Craig in handcuffs. After being treated on scene, Mr. Craig was transported to Howard University Hospital, where he received multiple staples to close

a four-inch laceration to his head.[25]

Officer Vance submitted a use of force report in connection with Mr. Craig's arrest that was not admitted into evidence at trial, but was raised with the Court at sentencing. According to the Government, Officer Vance's use of force report "failed to document (1) the additional baton strikes to [Mr. Craig's] head and neck area as he chased [Mr. Craig] out of the metro station; and (2) his choking of [Mr. Craig] outside the metro station. Instead, [Officer Vance] merely stated that [Mr. Craig] 'attempted to flee and was subdued after a struggle.'" The Government also noted in its sentencing memorandum that Officer Vance was found in violation of MTPD policy on two prior occasions for using unjustified force against arrestees' heads.

Officer Vance was indicted on July 25, 2019, on two counts of deprivation of rights under color of law under 18 U.S.C. § 242 — one for the baton strikes that resulted in significant bodily injury and the second for allegedly using the baton to choke Mr. Craig outside the Metro Station. *See* Indictment, No. 19-cr-251-RDM (D.E. 1). The jury convicted Officer Vance on Count One, finding that the use of the baton in striking Mr. Craig was excessive force, but acquitted Officer Vance on Count Two.

As stated by the Government, the Guidelines range was actually 108 to 135 months, with a total offense level of 31, but the PSR correctly noted that the statutory maximum for a violation

---

[25] In seeking the application of an enhancement for a serious bodily injury for Officer Vance, the Government filed a supplemental sentencing memorandum, where it stated that Mr. Craig sustained serious head injuries and suffered from persistent pain because of Officer Vance's conduct. *See* Gov't Supp. Sentencing Memorandum, No. 19-cr-251-RDM (D.E. 189). According to the Government, post his initial discharge, and during three follow-up visits, Mr. Craig complained of "headache, numbness to both hands and feet, and abdominal pain." He was given the diagnoses of "(1) [s]tatus post head injury; (2) abdominal pain non[-]specific; (3) [s]tatus post facial contusion; and (4) [o]ccipital head staple." Mr. Craig also complained of "gradually worsening head pain for [three] days associated with nausea, vomiting, [and] insomnia." The differential diagnoses were "post[-]concussion headache" and "post[-]concussion syndrome" and Mr. Craig was advised to follow up with a primary care doctor and "with Neurology."

of 18 U.S.C. § 242 (not resulting in death) is ten years imprisonment and reduced the range accordingly to 108 to 120 months, the statutory maximum.

In sentencing Officer Vance, this Court, nonetheless, granted several variances and downward departures based on the facts of the case and Officer Vance's history and characteristics. Notably, the Court granted departures for victim misconduct (pursuant to § 5K2.1), susceptibility to prison abuse (pursuant to § 5K2.0), and Officer Vance's service (pursuant to § 5H1.11). In granting a further variance under the Guidelines, the Court noted that the sentence needed to be no more than necessary to serve the purposes of sentencing, and that Officer Vance had lost his employment, there was no evidence of racial animus in the actions that he took, and Officer Vance was in compliance with his release conditions during the years the case had been pending.

Accordingly, from a Guidelines range of the statutory maximum of ten years, the Court reduced the Guidelines and ultimately sentenced Officer Vance to one year and one day of incarceration, thereby allowing him to be eligible for an initial reduction in the sentence for good time credit. The district court also allowed Officer Vance to self-surrender to the Federal Bureau of Prisons ("BOP") and specifically designated him to a low-level facility, although evidence was placed in the record by the Federal Public Defender ("FPD") that given the nature of the offense, it was more likely than not that BOP would not designate Officer Vance to a low-level BOP-Camp facility.[26]

The district court's analysis in *Vance* can be applied to this case. Similar to Officer Vance,

---

[26] Although FPD made this request on behalf of Officer Vance, it noted to the district court that it was unlikely that BOP would honor the request given the nature of the offense and the district court shared in FPD's concerns in that regard. *See United States v. Andra Vance*, No. 19-cr-251-RDM (D.E. 201-1) (enclosing supporting affidavit from consultant and former BOP employee as to likely security designation).

Sgt. Jevric has been in compliance with his release conditions while on unpaid administrative leave for years now without a single violation, lost his continued employment as a result of the events at issue, and will suffer real consequences as a convicted felon and on supervised release. Applying the § 3553 factors, as a variance under the Guidelines, as permitted by the terms of the plea agreement, Sgt. Jevric is susceptible to prison abuse, has a lengthy history of public service, and, contrary to reports in the press and in protests, there is absolutely no evidence of racial animus in this case. The radio communications of multiple officers, male and female, black and white, trying to resolve a dangerous situation, were not actions undertaken with an intent to hurt or punish anyone. The conduct was negligent. It was reckless. But it was not the product of malice.

The similarities end there, however, as Officer Vance took deliberate actions with specific intent, using a baton that left an individual bleeding from the head when the person posed no danger to anyone. As the Government noted at Officer Vance's sentencing, there were other prior incidents of force in Officer Vance's history, while Sgt. Jevric did not incur any sustained findings for excessive force. Sgt. Jevric's documented medical history that limited his ability to process situations and PTSD further distinguishes him from Officer Vance and warrants additional consideration as a basis for a downward variance in this case.

In summary, if a year and a day of incarceration was an appropriate sentence for Officer Vance with the Guidelines at the statutory maximum, a sentence of probation is appropriate for Sgt. Jevric, whose sentencing Guidelines range is much lower than that of Officer Vance.[27]

---

[27] In imposing incarceration for Officer Vance, this Court reasoned that while it was a difficult decision, it was necessary given the sentences that the Court was imposing on January 6 defendants for assaulting law enforcement, as the Court did not want to create improper sentencing disparities. Unlike in *Vance*, in this case, Sgt. Jevric heroically defended the U.S. Capitol against thousands of individuals who saw to unlawfully enter inside, while being subjected to threats and imminent physical danger. *See* Ex. 4 at 4-5.

### Government's Sentencing Comparators

The Government's sentencing comparators are wholly inapplicable to this case. A comparison to the high-profile murder of George Floyd is not only *not* "apt," it is extremely disappointing. *See* Gov't Sent. Mem. at 17 (D.E. 27). It is disrespectful to the family of George Floyd. It is also disrespectful to Sgt. Jevric. And the fact that the Government cannot see the difference between that case and this case speaks volumes. Sgt. Jevric did not punish anyone, especially someone screaming for his life. Rather than failing to render aid, officers immediately attempted to provide medical aid to Mr. Gilmore. While Sgt. Jevric has to live with the consequences of his actions for the rest of his life, he is not a murderer, regardless what anyone says otherwise.

The Government's other comparator cases similarly provide little guidance to this Court.

In *United States v. Slager*, No. 2:16-cr-378-RMG-1 (D.S.C.), an *unarmed* subject fled the scene of a traffic stop, was first tased to the ground, then got up and was shot eight times in the back when running from the defendant. As the Government acknowledged, unlike this case, in *Slager*, the defendant's conduct was treated as second degree murder and not involuntary manslaughter and the defendant obstructed justice, which Sgt. Jevric did not do. *See* Gov't Sent. Mem. at 18 (D.E. 27).

Comparing this case to the facts of *United States v. Sheffler*, where jail guards conspired to murder an inmate as part of a culture to abuse inmates, is equally inappropriate. In that case, three correctional guards assaulted a prisoner while he was restrained and handcuffed behind his back and while he posed no physical threat. The prisoner suffered broken ribs, a punctured mesentery, and serious internal injuries, and eventually died. After the assault, all three defendants failed to ensure the prisoner received medical care and instead sought medical attention for their own minor

scratches, falsified incident reports that they filed with prison officials, and lied to the Illinois State Police by denying any knowledge of or participation in the assault.[28] That is not this case and its citation to this Court as authority is seriously misplaced.

The Government's assertion in its sentencing memorandum (at 18-19 & n.10) that the sentence in *United States v. Duron Hudson* aligns with the requested sentence in this case is also mistaken. Mr. Hudson repeatedly hit a homeless man with rocks until he was knocked down and sustained injuries and was subsequently hit by a car. Mr. Hudson's sentence resolved multiple felony crimes of violence on separate days, including three separate robberies, where he seriously injured the victims trying to take their property.[29] That case does not justify the requested sentence in this case.

As with *Duron*, the Government's reliance on *United States v. Reginald Johnson* (at 18 & n.9) as an appropriate comparator is equally mistaken, when the defendant in that case killed one individual and caused serious bodily injured to another passenger (requiring consecutive sentences) and when the defendant "had six drinks in four hours" and "then left to head to another bar, piling seven people into his Jeep Cherokee even though it only fit five people." Most notably, the defendant *previously* had been convicted of driving under the influence, the same conduct that led to the death in the case cited by the Government.[30]

Here, Sgt. Jevric had no prior sustained use of force violations and was considered by his

---

[28] *See* DOJ Press Release, https://www.justice.gov/usao-cdil/pr/second-illinois-prison-guard-sentenced-20-years-imprisonment-following-conviction, last visited August 1, 2024.

[29] *See* DOJ Press Release, https://www.justice.gov/usao-dc/pr/eight-year-prison-term-handed-down-connection-teen-crime-spree-ended-death, last visited August 1, 2024.

[30] *See* https://wtop.com/dc/2023/11/philadelphia-man-sentenced-to-8-years-in-drunken-driving-crash-that-killed-promising-gw-business-student/, last visited August 1, 2024.

colleagues to be a trustworthy and a dedicated public servant. *See* Exs. 2-6.

### 7.    Restitution.

Sgt. Jevric respectfully requests that this Court not order restitution in this case. Mr. Gilmore's family has filed a $100 million dollar lawsuit against Sgt. Jevric and the District of Columbia and has continued mediation in the case until after Sgt. Jevric's sentencing, as plaintiffs admittedly realize the significance of Sgt. Jevric's conviction. Moreover, while the Government's investigation has been pending for years, it has failed to provide any documentation in support of its restitution claim, even when undersigned counsel requested an extension of time to prepare for sentencing (which was initially opposed by the Government and subsequently rescheduled two weeks earlier than additionally planned to accommodate the Government). Moreover, providing restitution information at the sentencing hearing is completely inconsistent with how restitution is ordered in federal cases.

Federal Rule of Criminal Procedure 32(c)(1)(B) requires that "[i]f the law permits restitution, the probation officer must conduct an investigation and submit a report that contains sufficient information for the court to order restitution." Fed. R. Crim. P 32(c)(1)(B); *accord* 18 U.S.C. § 3664(a) (requiring Probation to provide the Court "a complete accounting of the losses of each victim"). If needed, this Court "may require additional documentation or hear testimony." 18 U.S.C. § 3664(d)(4). If a victim's losses are still unascertainable by ten days before sentencing, the Government or the probation officer should inform the Court. 18 U.S.C. § 3664(d)(5). The Court should then set a date for the final determination of the victim's losses no later than 90 days after sentencing. 18 U.S.C. § 3664(d)(5). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence" with the government bearing the burden to establish the amount of loss suffered by the victim. *In re Sealed*

*Case*, 702 F.3d 59, 66 (D.C. Cir. 2012) (quoting 18 U.S.C. § 3664(e)). In this case, there was no recommendation prepared by U.S. Probation regarding an appropriate amount of restitution because the Government itself does not have a factual accounting to support its restitution claim.

Given that restitution will be resolved in the pending civil wrongful death action and there is no evidentiary support for an order of restitution at this time, Sgt. Jevric respectfully requests that this Court not enter a judgment of restitution, especially, when the defense would not be in a position to respond to any such claim on the fly at the sentencing hearing.

## II.   Sentencing Request and Recommendation.

A term of supervision is determined by reviewing many of the same § 3553(a) factors already considered above, including, relevant here: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for deterrence, to protect the public, and provide treatment to the defendant; (iii) the available sentences and sentencing range; (iv) relevant policy statements by the Sentencing Commission; and (v) the need to avoid sentencing disparities. *See* 18 U.S.C. § 3583(c). Accounting for these factors, as addressed above, Sgt. Jevric respectfully recommends a three-year period of supervised release under the "standard" conditions recommended by the Guidelines (*see* USSG § 5D1.3(c)) and a period of home confinement.[31] These conditions will significantly restrict Sgt. Jevric's liberty and provide a daily reminder of his criminal conduct by requiring that he, among other things:

- • regularly report to his probation officer;
- • seek permission from the Court or his probation officer to leave Maryland;

---

[31] A statutorily compliant sentence can include one day of incarceration or Sgt. Jevric's brief detention in the United States Marshals Service's holding cell at the United States District Court pending imposition of his term of supervised release. Sgt. Jevric was also initially briefly detained by the United States Marshals Service pending his release from custody at his initial appearance. Accordingly, in the alternative, Sgt. Jevric respectfully asks this Court to consider a sentence of time served to be followed by three years of supervised release.

• respond truthfully to questioning by his probation officer;
• live in an approved residence and notify his probation officer of any address change;
• allow his probation officer access to his residence;
• notify his probation officer of any job change;
• refrain from knowingly communicating with criminals;
• notify his probation officer if he is arrested;
• refrain from possessing a firearm or other dangerous weapons; and
• refrain from possessing illegal drugs or alcohol.

*See* PSR, ¶ 135.[32] A three-year period of supervised release, subject to these conditions, will provide adequate punishment and deterrence while allowing Sgt. Jevric to remain a productive member of society.[33]

---

[32] Sgt. Jevric requests that the standard condition of drug testing be removed from the supervised release conditions as there is no issue with substance abuse in this case, and accordingly, there is a "low risk of future substance abuse by the defendant." *See* PSR, ¶ 138. As Sgt. Jevric faces a $100 million dollar claim of compensatory damages and a separate $100 million dollar claim of punitive damages resulting from a lawsuit filed by Mr. Gilmore's family, the defense respectfully asks this Court to follow the Government's recommendation and not impose a fine in this case.

[33] To the extent this Court believes a period of incarceration is necessary, the defense respectfully requests that Sgt. Jevric be permitted to self-surrender, which would ensure that his safety is not jeopardized in transit to his final destination and would also automatically reduce his risk assessment score, thereby permitting him a greater likelihood of being placed in a lower security designation facility. This will also allow him the opportunity to immediately receive adequate mental and medical treatment. To further ameliorate any risk to Sgt. Jevric's security, the defense respectfully requests a recommendation to FPC Alderson or FCI Morgantown and that the Judgment and Commitment Order reflect the following language: "The Court strongly recommends placement in a minimum-security facility, given the defendant's lack of criminal history, compliance with bond conditions, and status as a former law enforcement officer."

## **CONCLUSION**

For the foregoing reasons and others that may appear to the Court or may develop at the sentencing hearing, Sgt. Enis Jevric respectfully requests that this Court impose a sentence of three years of supervised release, to include a period of home confinement.

Dated: August 1, 2024                    Respectfully submitted,

SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC

/s/ Christopher Macchiaroli
Christopher Macchiaroli (D.C. Bar No. 491825)
1775 I Street, NW, Suite 1150
Washington, DC 20006
Telephone: (202) 539-2444
Facsimile: (410) 547-2432
Email: cmacchiaroli@silvermanthompson.com

*Counsel for Defendant Enis Jevric*