IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | No. 23-cr-63-RDM |
| v. | : | |
| | : | |
| ENIS JEVRIC, | : | |
| | : | |
| *Defendant*. | : | |

**DEFENDANT'S SUPPLEMENT TO HIS SENTENCING
MEMORANDUM IN RESPONSE TO THE GOVERNMENT'S SUPPLEMENT**

The Defendant, Enis Jevric, through his undersigned counsel, respectfully supplements his sentencing memorandum by responding to the Government's Supplemental Sentencing Memorandum (D.E. 42-1) (the "Memorandum"). Though purporting to "clarify certain critical misstatements in the Defendant's sentencing memorandum," the Memorandum only serves to demonstrate the Government's continued misunderstanding underlying this matter and Sgt. Jevric's state of mind, both during the undisputably tragic events at issue and now, as he faces sentencing.

**I.      State of Mind for a Violation of 18 U.S.C. § 242.**

The Government takes issue with Sgt. Jevric's statements that he did not intend to harm or take the life of anyone during the events of August 25, 2021, maintaining that "intentional conduct is required for a § 242 violation." *See* Gov't Mem. at 1-2. The word "intentional," however, does not appear anywhere in the Statement of Offense for this case. Instead, the Statement of Offense provides as follows: "At the time Jevric fired one of the fatal shots, he was acting *willfully and unconstitutionally*, *in reckless disregard* of Gilmore's Fourth Amendment right to be free from an objectively unreasonable use of force." Statement of Offense (D.E. 22), ¶ 8 (emphasis added).

As Sgt. Jevric noted in his sentencing memorandum, the jurisprudence on the issue of willfulness permits the entry of a guilty plea in this case based on the still existing D.C. Circuit precedent that interprets "willfulness" to include "recklessness." *See United States v. Ehrlichman*, 546 F.2d 910, 921 (D.C. Cir. 1976) (instructing that "even if the defendant did not in fact recognize the unconstitutionality of his act," he can be found "to have acted 'willfully,' *i.e.*, '*in reckless disregard* of constitutional prohibitions or guarantees'" (emphasis added) (citation omitted)); *see also* Def.'s Sent. Mem. at 21 (D.E. 35) (citing the same). Without such jurisprudence, there would be no way to reconcile the *mens rea* required for the § 242 charge, *i.e.*, "willful," with the *mens rea* for the involuntary manslaughter charge, *i.e.*, negligent or unintentional.[1]

The Government knows that its objection is without merit as last year the same Civil Rights Section of the U.S. Attorney's Office argued to this Court that reckless conduct satisfies the willfulness element of a § 242 charge. *See United States v. Mark Clark*, No. 20-cr-151-CJN, Gov't Mem. at 7 (D.E. 120) (arguing that "willfulness can be proven with acts in open defiance *or reckless disregard* of a constitutional requirement that is specific and definite" (emphasis in original); *id.* at Mem. Opp'n at 10 (D.E. 125) (permitting willfulness to be established by reckless conduct) (citing *Screws v. United States*, 325 U.S. 91, 101 (1945); *United States v. Reese*, 2 F.3d 870, 885-86 (9th Cir. 1993); *United States v. Thao*, --- F.4th ----, 2023 WL 4991317, at *2 (8th Cir. Aug. 4, 2023); *United States v. Proano*, 912 F.3d 431, 442-43 (7th Cir. 2019); *United States v. Cowden*, 882 F.3d 464, 474 (4th Cir. 2018); *United States v. Johnstone*, 107 F.3d 200, 207-09 (3d Cir. 1997)).

---

[1] Notably, it seems as though the only reason there is a federal charge in this matter is the Government's desire to prosecute this case in federal court, rather than D.C. Superior Court, and to bolster its civil rights offense statistics. The real charge, with higher guidelines and a larger impact on sentencing, is the *involuntary* manslaughter charge, which is based on *unintentional* conduct.

Sgt. Jevric has acknowledged that it was *reckless* to continue firing as Mr. Gilmore's car moved down the street. Consistent with this acknowledgement, the Government proceeded with the involuntary manslaughter charge, rather than charges for voluntary manslaughter or second-degree murder. Consequently, any suggestion by the Government that Sgt. Jevric is attempting to undermine or negate his guilty plea is unfounded. Again, the Government knows this as it sought to confirm whether Sgt. Jevric was seeking to withdraw his guilty plea and therefore undermine his acceptance of responsibility based on his sentencing memorandum. In response, undersigned counsel notified the Government in writing:

> I think the only rational conclusion from anyone reading the defendant's sentencing memorandum is how sincere and remorseful Sgt. Jevric is and how his history and characteristics warrant the most lenient sentence possible. *Nothing* in the sentencing memorandum reads anything like 'actual innocence,' 'withdraw guilty plea,' or anything even close to someone not taking responsibility for his conduct. Rather than find ways to further prosecute Sgt. Jevric in this case, I was hoping the Government's review of the sentencing memorandum would make the Government rethink its request for a top of the Guidelines sentence in this case. Unfortunately, I am sadly mistaken.

Aug. 6, 2024 Email to Gov't Counsel at 1 (emphasis in original).

Regarding the Government's complaint regarding the inclusion of facts "subsequently learned" after the shooting (Gov't Mem. at 3), Sgt. Jevric is not suggesting that the responding officers knew Mr. Gilmore's criminal history on scene. Instead, Sgt. Jevric included those facts in his sentencing memorandum to counter the suggestion, sprinkled throughout the Government's sentencing memorandum, that Mr. Gilmore had committed no crime and presented no danger, though in possession of a firearm in his waistband while incapacitated in a running vehicle. The facts are relevant to explain that Mr. Gilmore's actions in raising his hands upon noticing the officers, and then deciding to drive away, worsened the situation by fleeing, as his actions in attempting to flee were as much the product of his outstanding felony assault with a gun warrant

3

and status as a felon in possession, than simply the product of an individual startled while being awoken in a vehicle.[2]

II.     **The Facts in Sgt. Jevric's Sentencing Memorandum Are Supported by the Record.**

The Government contends that Sgt. Jevric "misstates several facts that are material to sentencing." *See* Gov't Mem. at 5. The three categories of facts challenged by the Government, however, are supported by the record in this case.

*First*, Mr. Gilmore's vehicle proceeded up the street towards police cruisers and there was a pedestrian in the vicinity, creating a dangerous situation, which is why Sgt. Jevric continued to fire when thinking that Mr. Gilmore had lifted up his firearm. The Government removed from an initial draft of the Statement of Offense a reference to no pedestrians at the request of Sgt. Jevric, because it was not true. The Government's claim that the vehicle did not proceed down the street past police vehicles with Sgt. Jevric and officers in pursuit defies the video evidence in this case.



---

[2] It bears mentioning that even if Mr. Gilmore did have a permit to carry a firearm, which (as it was later confirmed) he did not, "he was carrying it improperly." Witness 1 GJ Tr. at 27-28 ("You just can't put it in your waistband, so the fact I saw that it was just in his waistband, it didn't appear to be in a holster, it showed me that at the very minimum, even if he did have a permit to carry a firearm, that he was carrying it improperly. And then there's . . . certain steps that are taken to remedy that issue . . . .").

*See* Gov't Sent. Mem., Ex. 1. at 2:30.

The Government's never-ending attempt to make Sgt. Jevric seem not credible — such as when trying to find evidence of alleged collusion by officers or obstruction or when trying to undermine his current medical and mental health condition — is unwarranted in this case. The Government cannot rest its top of the guidelines sentencing recommendation based on a purported bad character because the facts do not support such allegations. In fact, Sgt. Jevric's history and characteristics completely reject such claims. This is a tragic set of circumstances, but Sgt. Jevric did not wake up one day after fourteen years of service and decide that he wanted to take the life of another human being. The actions of officers leading to this tragic outcome highlight the complex and dangerous circumstances they faced on that day.

*Second*, the Government's assertion that the presence of an officer with an assault rifle "was standard procedure where officers are approaching an armed person" is entirely misleading. *See* Gov't Mem. at 4. The officer in question was not a tactical officer. Moreover, the Metropolitan Police Department ("MPD") changed its policy *after* this case to make an armed individual in a locked vehicle a barricade situation. And, although the officer with the rifle did testify that he "never once removed the safety on his rifle," *see id.*, he also stated that "[i]t literally takes a split second to take it off of safety," so he was prepared to use the rifle if necessary and was merely "[w]aiting for somebody to say [Mr. Gilmore] was going for his gun or the gun came up." Witness 2 GJ Tr. at 27.[3] The Government cannot claim this was just another routine day in Washington, DC with an individual asleep in his car, but then say, pointing an assault rifle at a vehicle was just standard procedure.

---

[3] Consistent with this Court's August 19, 2024 Minute Order, the defense is redacting all grand jury witness names and will identify them at the sentencing hearing if permitted by the Court.

5

*Third*, numerous other officers present confirmed that the situation encountered on August 25, 2021 was uncommon. *See, e.g.*, Witness 3 GJ Tr. at 67 ("I could tell you that that was the first time I've seen somebody armed in the car asleep."); Witness 2 GJ Tr. at 55 ("Q. How often are those people armed or how often is there a weapon in the car? A. I don't believe I've ever had a call where the person was drunk or high behind the wheel and asleep with a gun. Q. This was the first time you remember? A. Correct."); Witness 4 GJ Tr. at 15 ("Q. Now prior to this incident, have you had a call for a person unresponsive in a vehicle where there's been a weapon visible in the car? . . . A. Not before this incident. Q. So this was the first time that you got to the scene and there was a weapon visible in the car? A. Correct.").

Multiple officers present on scene also confirmed that they did not have sufficient or complete training on how to address the situation faced in this case. *See, e.g.*, Witness 5 GJ Tr. at 62-63 ("Q. . . . [W]ere Sergeant Jevric and Officer [*Redacted*] positioned in line with what you've been trained to do when it comes to approaching vehicles? A. . . . [A]s far as a training scenario, I've never been through one like this."); Witness 6 GJ Tr. at 57 ("Q. In your training, do you receive any training on how officers should position themselves to get someone who's armed out of the vehicle safely? A. . . . [W]e go through scenarios that might have encompassed . . . that kind of thing, but I mean there's not specific training on it."); Witness 7 GJ Tr. at 11 ("Q. How are you trained to use ballistic shields? A. It's not extensive. As a patrol officer, it was just pretty much kind of you use it as a barrier in between you and your threat given -- but we also understand that the shields given to us in the patrol districts aren't good[.]"); Witness 8 GJ Tr. at 42 ("Q. Does your training tell you that you should use any kind of tactics to get this person who's asleep with a weapon to wake up so that you can talk to them and try to figure out what's going on? A. No. It just depends on the actions of the person that has the weapon.").

6

Citing to the transcript of its expert witness, who was not present for the events at issue, the Government suggests that the only applicable training related to "how to approach a suspect in a car who is armed." *See* Gov't Mem. at 4. In reality, the situation encountered on August 25, 2021 was much more complex, as shown by the above-referenced testimony. The officers were not used to encountering an unconscious *and* armed individual in a vehicle. They had not been through an analogous training scenario, nor was there sufficient training on other aspects of the situation, such as the use of the ballistic shield. More generally, the Government ignores the fact that there were other supervisors, and higher-ranking officers on scene than Sgt. Jevric. Those individuals did not change the plan undertaken by the officers, including Sgt. Jevric's position at point, which was an inherently dangerous assignment.

**III.   The Most Pertinent Comparator Cases Warrant a Variance.**

The Government critiques Sgt. Jevric's comparator cases on the basis that none "involve[] a death-resulting § 242 violation" and "[v]irtually none of them involve involuntary manslaughter." Gov't Mem. at 5. As noted above, the more significant charge in this matter, with higher guidelines and a larger impact on sentencing, is the *involuntary* manslaughter charge, which is based on *unintentional* conduct. For this reason, the most pertinent comparator cases are those involving *unintentional* or *involuntary* conduct. By the same token, cases involving intentional misconduct resulting in death are not relevant for comparison purposes.[4]

The Government has made abundantly clear its belief that Sgt. Jevric deserves a sentence of incarceration. But the outcome of the tragic events is only one factor to be considered at

---

[4] The Government asserts in its supplement (at 7) that "defendant-officers in Potter and Mehserle believed they were reaching for their tasers, instead of their guns." In *Potter*, according to the publicly available sworn affidavit in support of an arrest warrant, the defendant former officer was taking a picture with trainees in a secure facility and as a joke brandished his firearm at a trainee resulting in its discharge. Officer Jevric was not brandishing a weapon as a joke, but dealing with

sentencing. This Court has a duty to consider the mere seconds at issue in the context of Sgt. Jevric's otherwise lawful life, including his total compliance with the terms of his supervision, his immediate acceptance of responsibility, and his genuine remorse. In addition, a proper sentence considers the other consequences that accompany Sgt. Jevric's decision to accept responsibility and plead guilty, namely, the loss of his chosen profession and the rights he will no longer have as a felon, as well as, his current mental and physical health. Overall, the § 3553(a) factors do not call for incarceration, only the Government does. And while the events at issue are tragic, not all death proximately caused by another results in incarceration, as seen by the hundreds of wrongful death and negligent civil tort cases brought each day in this country.

Respectfully, Sgt. Jevric asks this Court to consider the mere seconds of his conduct alongside his fourteen years of service to the community and otherwise lawful life since his immigration to this country when rendering a sentence in this case.

Dated: August 23, 2024                    Respectfully submitted,

                                          **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

                                          /s/ Christopher Macchiaroli
                                          Christopher Macchiaroli (D.C. Bar No. 491825)
                                          1775 I Street, NW, Suite 1150
                                          Washington, DC 20006
                                          Telephone: (202) 539-2444
                                          Facsimile: (410) 547-2432
                                          Email: cmacchiaroli@silvermanthompson.com

                                          *Counsel for Defendant Enis Jevric*

---

an armed incapacitated individual in the public thruway and under those dangerous circumstances, was required to make a split-second decision.