**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ENIS JEVRIC,<br><br>*Defendant.* | Civil Action No. 23-cr-63 (RDM) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Pending before the Court is Defendant Enis Jevric's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.  Dkt. 67.  For the reasons set forth below, the Court will **DENY** Defendant's motion.

**I. BACKGROUND**

At approximately 3:00 a.m. on August 25, 2021, Jevric, who was a Sergeant in the Metropolitan Police Department ("MPD") at the time, was dispatched to the intersection of New York Avenue and Florida Avenue in Northeast Washington, D.C.  Dkt. 22 at 1 (Statement of Offense ¶¶ 2, 4).  When Jevric arrived, he and other officers at the scene encountered a potentially dangerous situation.  A man, later identified as An'Twan Gilmore, was passed out or asleep in the driver's seat of a car with a handgun in his waistband.  *Id.* at 1 (Statement of Offense ¶ 4).  The car was running, and the brake lights were illuminated.  Dkt. 31 at 1, 4.  Jevric approached the driver's side window of the car, carrying a ballistic shield in one hand and his MPD-issued firearm in the other.  Dkt. 22 at 2 (Statement of Offense ¶ 5).  At Jevric's direction, another officer knocked on the car's window with a baton, waking Mr. Gilmore.  *Id.* (Statement of Offense ¶¶ 5–6).  The car moved forward several feet, stopped briefly, and then moved forward again.  *Id.* (Statement of Offense ¶ 6).  As the car began to move forward for the second

time, Jevric fired four shots at the car, and, as the car continued to move down New York Avenue, he fired six additional shots. *Id.* All told, Jevric fired ten shots as the car rolled away from him and the others, while no other officer at the scene, including several who were also near the car, fired a single shot at the car. *Id.*; *see* Dkt. 67 at 5–7. Three of Jevric's shots hit Mr. Gilmore, two of which inflicted mortal wounds. Dkt. 22 at 2 (Statement of Offense ¶ 7). Mr. Gilmore was pronounced dead "a short time later." *Id.*

A federal grand jury returned a three-count indictment charging Jevric with Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242; Use of a Firearm to Commit Murder, in violation of 18 U.S.C. § 924(c) and (j); and Murder in the Second Degree, in violation of § 22-2103 of the D.C. Code. Dkt. 1. The parties engaged in negotiations to resolve the case prior to trial. On February 14, 2024, Jevric agreed to plead guilty to the federal civil rights offense, and one count of Involuntary Manslaughter, in violation of D.C. Code § 22-2105. Dkt. 21 at 1. In exchange, the government agreed to dismiss all other charges. *Id.* at 2. The plea agreement also contained several express waivers, including, as relevant here, a waiver of Jevric's right to bring a collateral challenge to "the conviction entered or sentence imposed" under the agreement, "except to the extent such a motion is based on newly discovered evidence or on a claim [of] ineffective assistance of counsel." *Id.* at 8.

The United States subsequently filed a two-count Superseding Information, which dropped the Section 924(c) and (j) charge and reduced the D.C. charge from Second Degree Murder to Involuntary Manslaughter in violation of § 22-2105 of the D.C. Code. *See* Dkt. 19. On February 23, 2024, Jevric appeared before the Court and pled guilty to both counts of the Superseding Information. *See* Min. Entry (Feb. 23, 2024). Pursuant to the plea agreement, Jevric admitted that he had "act[ed] willfully and unconstitutionally, in reckless disregard of

2

Gilmore's Fourth Amendment right to be free from an objectively unreasonable use of force."

Dkt. 22 at 2 (Statement of Offense ¶ 8).  Jevric also admitted that his "conduct created an

extreme risk of death to Gilmore and was a gross deviation from a reasonable standard of care."

*Id.*

At sentencing, the government urged the Court to impose a sentence of 84 months, which

was at the high end of the D.C. Voluntary Guidelines range for the manslaughter count.  Dkt. 31

at 1, 15.  After considering all the relevant sentencing factors, the Court imposed a sentence of

60 months incarceration on the D.C. law count and a sentence of 46 months on the federal count.

Dkt. 56 at 1, 3.

After sentencing, Jevric learned that on March 8, 2009, more than twelve years before the

fatal events of August 25, 2021, he had encountered Mr. Gilmore while on duty.  Dkt. 67 at 9.

At the time, Mr. Gilmore was a minor and under the influence of drugs and in possession of an

air rifle.  *See id.* at 9–10; Dkt. 58 at 79.  Jevric issued multiple oral commands to Mr. Gilmore

and "plead[ed] with" him to drop the rifle.  Dkt. 67 at 10 (quoting MPD Form PD-379 (Mar. 8,

2009)).  Mr. Gilmore eventually dropped the air rifle "without any incident or injury."  *Id.*

On August 28, 2025, Jevric moved to vacate, set aside, or correct his sentence pursuant to

28 U.S.C. § 2255(a) on the ground that the government violated *Brady v. Maryland*, 373 U.S. 83

(1963), by failing to disclose his prior encounter with Mr. Gilmore.  Dkt. 67.  The motion is ripe

for decision.  *See* Dkts. 82, 83, 86, 88.

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255, a prisoner serving a sentence imposed by a federal court may

move the sentencing court to vacate, set aside, or correct the sentence if it "was imposed in

violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral

attack." 28 U.S.C. § 2255(a). The required showing is a demanding one, which poses "a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982). The Court is "authorized to grant relief only if [it] determine[s] that the challenged sentence resulted from a fundamental defect which inherently results in a complete miscarriage of justice, or an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Pollard*, 959 F.2d 1011, 1020 (D.C. Cir. 1992) (internal quotation marks and citation omitted); *see also United States v. Ashton*, 961 F. Supp. 2d 7, 11 (D.D.C. 2013) (describing relief under Section 2255 as "an extraordinary remedy in light of society's legitimate interest in the finality of judgments"). The movant bears the burden of proof and must demonstrate his right to relief by a preponderance of the evidence. *See United States v. Simpson*, 475 F.2d 934, 935 (D.C. Cir. 1973) (per curiam); *United States v. Valdez*, 199 F. Supp. 3d 13, 17 (D.D.C. 2016).

### III. ANALYSIS

Jevric asks the Court to vacate, set aside, or correct his conviction and sentence on the grounds that the government's failure to disclose the 2009 encounter violated *Brady v. Maryland*, 373 U.S. 83 (1963).[1] Under *Brady*, prosecutors must "disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667, 675 (1985). Jevric raises two principal arguments in support of his *Brady* claim. He first argues that the 2009 encounter "would have been admissible evidence at trial and would have negated that [the] actions he took on August 25, 2021 were willful, as required by

---

[1] Jevric's motion is not the picture of clarity; the introductory paragraph asks the Court "to vacate, set aside, or correct his sentence," with no mention of his conviction, Dkt. 67 at 1, while the concluding paragraph asks the Court to "vacate his conviction," with no mention of his sentence, *id.* at 17. Giving him the benefit of the doubt, the Court will construe the motion to seek both forms of relief.

the statute." Dkt. 67 at 11.  He further contends that the 2009 encounter would have offered a "strong mitigating factor at sentencing." *Id.* at 12.  In Jevric's view, the encounter "showed that [he] was not an individual prone to violence and would have gone a long way to negate the claim by Mr. Gilmore's family that Mr. Gilmore's death was the result of race." Dkt. 88 at 3.  In response, the government argues that Jevric waived his right to bring the instant motion as part of his plea agreement and that, in any event, his *Brady* claim fails on the merits.  Dkt. 86 at 4.

Because Jevric's challenges to his conviction and sentence present slightly different legal issues, the Court will take each in turn.

## A.   Conviction

Because Jevric pleaded guilty, his challenge to his conviction does not present an ordinary *Brady* claim.  *Brady* is a trial right; it is principally concerned with ensuring that "criminal trials are fair."  373 U.S. at 87; *see United States v. Ruiz*, 536 U.S. 622, 631 (2002) (explaining that "due process considerations . . . led [the] Court to find *trial-related rights* to exculpatory and impeachment information in *Brady* and *Giglio*" (emphasis added)).  For that reason, the touchstone of the *Brady* inquiry is whether, in the absence of the withheld material, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *accord United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir. 2015).  A *Brady* claim, in other words, is a claim that the government's conduct deprived the defendant of a fair trial.  By pleading guilty, Jevric waived his right to a fair trial in exchange for concessions from the government, most notably a reduction in the charges he faced.  *See Ruiz*, 536 U.S. at 629.  Having waived his right to a fair trial, Jevric may not now bring a *Brady* claim challenging his conviction on the ground that he was deprived of a fair trial.

Jevric's decision to waive his right to trial by jury does not, however, leave his conviction completely invulnerable.  To be effective, a waiver of the right to trial by jury must be voluntary,

knowing, and intelligent—that is, "done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970); *see also Boykin v. Alabama*, 395 U.S. 238, 242 (1969). Jevric may therefore "attack the voluntary and intelligent character of [his] guilty plea." *Tollett v. Henderson*, 411 U.S. 258, 267 (1973). The Court will, accordingly, construe Jevric's *Brady* claim as an argument that the nondisclosure of the 2009 encounter rendered his guilty plea unknowing or involuntary. The collateral attack waiver in Jevric's plea agreement, Dkt. 21 at 8, moreover, does not bar this challenge because a defendant always retains the right to challenge his guilty plea on the grounds that it was not knowing and voluntary. *See Garza v. Idaho*, 586 U.S. 232, 239 (2019).

In *United States v. Ruiz*, the Supreme Court addressed whether the government's failure to disclose certain *Brady* material can render a guilty plea invalid. 536 U.S. 622. In that case, the Court considered whether the government's failure to disclose impeachment evidence during plea negotiations rendered the defendant's guilty plea unknowing or involuntary. *Id.* at 629. After weighing the value of impeachment evidence to defendants considering guilty pleas and the effect of early disclosure on the administration of justice, the Court concluded it does not. *Id.* at 629–33. Although impeachment evidence is "useful" to defendants, the Court could not characterize it as "critical" at the plea-bargaining stage "given the random way in which such information may, or may not, help a particular defendant" and its similarity to other kinds of information deemed inessential for a voluntary guilty plea. *Id.* at 629–31. At the same time, a constitutional obligation to disclose impeachment information during plea bargaining would risk premature disclosure of witness information and disruption of ongoing investigations and would deprive plea bargaining of its "main resource-saving advantages." *Id.* at 631–32.

*Ruiz* does not resolve Jevric's *Brady* claim, which is based on the government's failure to disclose allegedly exculpatory information, not impeachment information.  The Supreme Court and the D.C. Circuit have yet to consider whether a defendant may attack his guilty plea based on the government's failure to disclose exculpatory evidence prior to or during plea negotiations. Other circuit and district courts have split on this question, with the majority of courts concluding that a defendant may attack his guilty plea based on the government's nondisclosure of exculpatory evidence during plea bargaining.  *See United States v. Nelson*, 979 F. Supp. 2d 123, 129–30 (D.D.C. 2013) (summarizing circuit split).  *Ruiz* does, however, confirm that a guilty plea is not unknowing or involuntary merely because the prosecution failed to take some step that the Constitution would have required "had the defendant insisted upon a trial."  536 U.S. at 629.  Due process concerns vary at different stages of a criminal proceeding.  So too does the value of particular information (which may, of course, differ from case to case) and the costs of collecting and disclosing it (which may also differ from case to case).

For present purposes, the Court need not decide whether the government's failure to disclose exculpatory evidence can invalidate a guilty plea.  The government does not contest that the suppression of exculpatory evidence could render a guilty plea involuntary.  Nor does it dispute that the Court should apply *Brady*'s familiar three-prong test to determine whether Jevric voluntarily pleaded guilty.  Accordingly, the Court will simply assume that *Brady* applies.

Courts use a three-part test to determine whether the government committed a traditional *Brady* violation.  *United States v. Robinson*, 68 F.4th 1340, 1347 (D.C. Cir. 2023).  First, "[t]he evidence at issue must be favorable to the accused."  *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  Second, the "evidence must have been suppressed by the State, either willfully or inadvertently."  *Id.* at 282.  Finally, the suppressed evidence must have prejudiced the defendant.

*Id.* To establish prejudice under *Brady*, a defendant must show that the suppressed evidence was material—*i.e.*, that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. As the government points out, the relevant "proceeding" for purposes of Jevric's challenge to his conviction is the plea-bargaining process. *See* Dkt. 86 at 22–23. Accordingly, the Court will evaluate the materiality of the withheld information based on its effect on Jevric's decision to plead guilty, not a hypothetical trial that did not take place. *Cf. Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (requiring defendant challenging guilty plea on ineffective assistance of counsel grounds to show a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial"). In this respect, the use that Jevric could have made of the evidence at trial merits consideration, but only to the limited extent that it reasonably bore on his decision to plead guilty.

Assuming for present purposes that Jevric can satisfy the first two *Brady* requirements, he cannot show that the 2009 encounter was material to his decision to plead guilty. Jevric argues that he could have used the 2009 encounter at trial to establish that he did not act with the requisite mens rea to violate the federal civil rights offense, 18 U.S.C. § 242, or to commit second-degree murder, D.C. Code § 22-2103, both of which were charged in the original indictment. Dkt. 88 at 2–3; Dkt. 1 at 2–3. And he gestures at the possibility that the government's failure to disclose his prior encounter with Mr. Gilmore had a material bearing on his decision to plead guilty. Dkt. 67 at 15–16; Dkt. 88 at 15. If, in fact, the government failed to disclose evidence in its possession that "negated" the mens rea of either offense, Dkt. 88 at 14, that surely would have affected Jevric's decision to plead guilty. But that is not what happened here.

The 2009 encounter offers neither direct nor circumstantial evidence of Jevric's state of mind during the offense. Neither Jevric nor any of the other responding officers had any way to identify Mr. Gilmore that morning. He was alone in the car, which was registered to another owner, with no evident connection to Mr. Gilmore. Dkt. 31 at 1–2. The responding officers did not enter the car until after Jevric shot Mr. Gilmore. *Id.* at 5. According to Jevric, moreover, he did not know that the man in the car was Mr. Gilmore or that they had previously interacted more than a decade earlier. A coincidence of which Jevric was completely unaware at the time of the shooting could not have affected his state of mind during the offense. Nor would the 2009 encounter have informed the jury about the danger presented by an unresponsive, armed individual in a locked car, how Jevric perceived that danger, or why Jevric responded to that danger by using force. For that and other reasons, the Court is unpersuaded that evidence of the encounter would have even been admissible at trial. *See* Fed. R. Evid. 401, 402, 403, 404.

By Jevric's own account, he was "a well-respected law enforcement officer," who "served for fourteen years without a sustained finding of excessive force prior to the event at issue." Dkt. 35 at 28. That extensive record might have had tended "to make a fact more or less probable"—Fed. R. Evid. 401(a)—in particular, the fact that Jevric had or didn't have the requisite state of mind to commit the alleged crimes. But evidence that "Jevric previously arrested Mr. Gilmore years earlier when Mr. Gilmore was under the influence of drugs and in possession of an air rifle," Dkt. 67 at 9, has no bearing on Jevric's state of mind on August 25, 2021, and, if offered at trial, would likely have been excluded as irrelevant under Rule 401 and almost certainly would have been excluded as substantially more prejudicial than probative under Rule 403. Among other things, that evidence would have confused the jury and invited it to view Mr. Gilmore as a dangerous, repeat offender who posed a risk to Jevric and the other

officers—even though neither Jevric nor any of the other officers even knew that it was Mr. Gilmore in the car.  It would have, in short, presented inflammatory information about Mr. Gilmore's past that had no bearing on any question properly before the jury.

As Jevric's own arguments reveal, the 2009 encounter is, at best, character evidence, which Jevric posits he could have used to show his "respect for life and his willingness to avoid [the use of] deadly force."  Dkt. 67 at 13.  But even assuming that Jevric could have offered "specific acts of good character" in an effort to prove that he acted in "conformity" with those past acts and without the requisite criminal intent, a proposition that is far from clear, *see United States v. Ellisor*, 522 F.3d 1255, 1270–71 (11th Cir. 2008), and further assuming that he was prepared to open the door to the prosecution's use of rebuttal evidence, *see* Fed. R. Evid. 404(a)(2), it borders on the frivolous to suggest that Jevric's decision whether to plead guilty turned on whether he could have added to his arsenal of good-character evidence by including an incident that occurred over twelve years earlier involving a teenager with an air rifle.  The only reason that incident stands out is that it involved Mr. Gilmore.  But, as explained above, it is that coincidence that renders the evidence problematic, and it is difficult to imagine that Jevric would place the same weight (or any weight) on the 2009 incident if Mr. Gilmore's name were redacted.

In sum, the fact that the 2009 incident involved Mr. Gilmore is not only irrelevant but, if offered at trial, would have invited jury confusion and unfair prejudice.  Because Jevric did not know the identity of the man that he shot in the car on August 25, 2021, the fact that he previously interacted with Mr. Gilmore is a mere coincidence, and evidence of that coincidence would have been inadmissible at trial.  The Court, accordingly, concludes that "had the evidence

been disclosed to the defense," *Bagley*, 473 U.S. at 682, it would have had no reasonable bearing on Jevric's decision whether to plead guilty.

## B.    Sentence

The extent to which *Brady* applies to non-capital sentencings, in which a judge, rather than a jury, decides the sentence, is also unsettled by Supreme Court precedent. Although *Brady* held that the government must disclose evidence "material either to guilt or to punishment," it did so in the context of the penalty phase of a capital trial. 373 U.S. at 87. There, *Brady*'s underlying concern that criminal trials be conducted fairly is at its zenith. The due process considerations at a non-capital sentencing differ from those present during a criminal trial. At trial, due process requires that "criminal defendants be afforded a meaningful opportunity to present a complete defense," which requires "constitutionally guaranteed access to evidence." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "The requirements of due process are not suspended with the pronouncement of guilt, but continue to operate in the sentencing process." *United States v. Lemon*, 723 F.2d 922, 933 (D.C. Cir. 1983). This means, for example, that "the sentencing judge may not rely on mistaken information or baseless assumptions." *Id.* It is less clear, however, whether and how the government's obligation to disclose evidence that is "favorable to the accused," *Strickler*, 527 U.S. at 281, extends to sentencing, where, among other things, the realm of potentially germane considerations is far broader and less well defined.

Although the D.C. Circuit has yet to address the issue, many courts have nonetheless held or assumed that the government has *Brady* obligations during non-capital sentencings, including in cases in which the defendant pleads guilty. *See, e.g.*, *United States v. Flynn*, 411 F. Supp. 3d 15, 30 (D.D.C. 2019) (applying *Brady* to post-guilty plea non-capital sentencing); *United States v. Severson*, 3 F.3d 1005, 1012–13 (7th Cir. 1993) (applying *Brady* to post-trial non-capital sentencing). And, once again, the Court need not for present purposes resolve whether and to

11

what extent *Brady* applies to non-capital sentencings because the government does not contest that its failure to disclose evidence favorable to the defense can render a non-capital sentencing fundamentally unfair. The Court will, accordingly, apply *Brady* to Jevric's challenge to his sentence as well. First, however, the Court must decide whether Jevric waived the right to bring the instant motion as part of his plea agreement.

1.      *Collateral attack waiver*

By entering into a plea agreement, a defendant may waive his right to bring certain claims on direct appeal or via collateral attack. *Khadr v. United States*, 67 F.4th 413, 419 (D.C. Cir. 2023). Appeal waivers facilitate the plea-bargaining process by "improv[ing] the defendant's bargaining position and increas[ing] the probability he will reach a satisfactory plea agreement." *United States v. Guillen*, 561 F.3d 527, 530 (D.C. Cir. 2009). Even an anticipatory waiver made before the defendant knows what his sentence will be is enforceable, so long as the defendant's "decision is knowing, intelligent, and voluntary." *Id.* at 529; *Khadr*, 67 F.4th at 419. To interpret the scope of a waiver provision, "we apply contract principles." *Khadr*, 67 F.4th at 419. Consistent with the well-established principle that ambiguity in a contract is construed against the drafter, *see In re Sealed Case*, 702 F.3d 59, 63 n.2 (D.C. Cir. 2012), courts "will not enforce an appeal waiver that only arguably or ambiguously forecloses [the defendant's] claims," *Khadr*, 67 F.4th at 419 (citation modified).

The government contends that the collateral attack waiver in Jevric's plea agreement encompasses the present motion. Dkt. 86 at 6. Under that provision, Jevric waived the right to challenge his sentence or conviction "in any collateral attack . . . except to the extent such a motion is based on newly discovered evidence or on a claim that [Jevric] received ineffective assistance of counsel." Dkt. 21 at 8. In the government's view, Jevric has not established that information regarding his prior encounter with Mr. Gilmore constitutes "newly discovered

evidence" given the "integral role" that he played in the encounter.  Dkt. 86 at 7–8.  The government points out that Jevric's opening brief indicates that his counsel learned of the prior encounter after sentencing but did not indicate whether Jevric remembered the encounter.  *Id.* at 7; *see* Dkt. 67 at 1–2.  Implying that if Jevric could remember the encounter, his claim would not be based on "newly discovered evidence," the government urges the Court to summarily deny Jevric's Section 2255 motion without considering the merits of his *Brady* claim.  Dkt. 86 at 7–8.

For guidance on the scope of Jevric's collateral attack waiver, the Court looks to cases interpreting "newly discovered evidence" in the context of motions for a new trial under Federal Rule of Criminal Procedure 33.  Under Rule 33, a motion for a new trial "grounded on newly discovered evidence" may be filed within three years, rather than the usual 14 days, of "the verdict or finding of guilty."  Fed. R. Crim. P. 33(b)(1).  In *United States v. Torres*, the D.C. Circuit held that "where a defendant *knows* the facts supporting his . . . claim at the time of trial, those facts are not 'newly discovered' for the purposes of Rule 33."  115 F.3d 1033, 1037 (D.C. Cir. 1997) (emphasis in original).  "A contrary interpretation," the court explained, "would . . . defy the Rule's plain language."  *Id.*; *see also id.* at 1035 (collecting cases from other circuit courts adopting the same rule).  Applying that rule, the court found the defendant's motion untimely because he "knew the factual basis of his ineffective assistance claim—the alleged language barrier between him and his lawyer—at the time of his 1991 trial."  *Id.* at 1037.

Just as the plain language of Rule 33 controls, so too does the plain language of Jevric's collateral attack waiver.  *See United States v. Hunt*, 843 F.3d 1022, 1027 (D.C. Cir. 2016).  Jevric must show that he did not know the "facts supporting his . . . claim" at the time of sentencing.  *Torres*, 115 F.3d at 1037.  Jevric satisfies that standard here.  Regardless of how much Jevric remembered of the 2009 encounter prior to sentencing, he was not aware of the

13

"factual basis" of his *Brady* claim—namely, the government's possession of specific arrest records documenting the 2009 encounter—prior to sentencing. The government errs by focusing on Jevric's memory of the 2009 encounter, which is not the basis of Jevric's Section 2255 claim, rather than the government's alleged suppression of its records of the 2009 encounter. Because it is undisputed that Jevric was unaware during sentencing that the government possessed evidence of the 2009 encounter between himself and Mr. Gilmore, the collateral attack waiver in his plea agreement does not bar his claim.

    2.    *Brady violation*

Although not barred by his plea agreement, Jevric's challenge to his sentence fails for the same reason as his challenge to his guilty plea. Even assuming (without deciding) that Jevric satisfies the first two *Brady* requirements, he cannot show that there is a "reasonable probability" that information about the 2009 encounter would have resulted in him receiving a lower sentence. In Jevric's view, the 2009 encounter was material to his sentence because it would have shown that he "was not an individual prone to violence" and would have negated the suggestion that "Mr. Gilmore's death was the result of race." Dkt. 88 at 3; *see also* Dkt. 67 at 12 ("It would also negate the wrongful and vile impression that Sgt. Jevric did not value Mr. Gilmore's life because he was a police officer and Mr. Gilmore was a young African American male in the District."). Neither argument is persuasive.

Jevric's lack of propensity for violence and general character were fully presented and considered at sentencing. Although the Court was not aware of the 2009 encounter, it knew that Jevric had "served the District of Columbia for nearly 14 years without a single sustained finding of unreasonable force." Dkt. 88 at 27; *see* Dkt. 58 at 82. In light of that spotless record, the Court twice characterized Jevric's conduct during the fatal encounter as "aberrational." Dkt. 58 at 83–84; *see also id.* at 59 ("But what he did that day doesn't seem to connect with the rest of

his life, as far as I can tell.").  The fact that Jevric lacked any history of excessive force mattered

to the Court's assessment of the § 3553 factors and determination of the appropriate sentence.

Reflecting on the "characteristics of the defendant," 18 U.S.C. § 3553(a)(1), the Court observed:

> [T]his is one of the things that is just so confounding about this case.  Because
> as far as I can tell, this is the one mark against Mr. Jevric.  He did a terrible
> thing that day.  But he is not somebody with any prior use of excessive force.  I
> can tell you[] that my sentence would be significantly higher if this was a case
> in which he ever used excessive force previously and there was any finding of
> excessive use of force prior to this.

Dkt. 58 at 82.  In addition to Jevric's spotless record, the Court also received and considered

numerous letters of support written by Jevric's colleagues, exhorting the Court to take into

account Jevric's positive outlook, professionalism, and leadership throughout his career.  Dkt.

50-1 at 56–66.

So, when Jevric says it "should come as no surprise" that during the 2009 encounter he

"made numerous attempts to have Mr. Gilmore drop his weapon and was able to successfully de-

escalate the situation and preserve Mr. Gilmore's life, even at the risk to his own safety," Dkt. 88

at 1, the Court is in agreement.  Jevric's conduct during the 2009 encounter with Mr. Gilmore is

precisely what the Court would expect in light of Jevric's many years of service and previously

unblemished record on the use of force.  Over the course of his fourteen years as a police officer

prior to the offense, Jevric presumably faced many dangerous situations.  That they were all

resolved without the excessive use of force is far stronger evidence of Jevric's character,

approach to his work, and lack of proclivity for violence than a single incident that took place

more than a decade before the offense.  The fact that the 2009 encounter involved Mr. Gilmore is

no more than a poignant reminder that he might still be alive had Jevric employed the same

judgment and restraint on August 25, 2021, that he displayed throughout his career.

Jevric's further contention that the 2009 incident "would have gone a long way to negate the claim by Mr. Gilmore's family that Mr. Gilmore's death was the result of race" is no more persuasive. Dkt. 88 at 3. A careful examination of the sentencing transcript reveals that this argument is directed at Jevric's perception of the victim impact statements given by Mr. Gilmore's loved ones, not necessarily their substance. More importantly, Jevric's argument is unresponsive to the explanation that the Court gave for its sentence.

For context, at the sentencing hearing, the Court heard from many of Mr. Gilmore's friends and family members who watched the video of the fatal events of August 25, 2021, and spoke about their losses and impressions of what had gone wrong. One of Mr. Gilmore's cousins characterized Jevric as "in a split second los[ing] control of every emotion." Dkt. 58 at 65. Another of his cousins testified that Jevric "made an impulsive decision that changed his life and our life forever." *Id.* at 69. Many of Mr. Gilmore's loved ones also testified that Mr. Gilmore's death affected their perception of law enforcement by, for example, causing them to fear and distrust police officers. *See, e.g.*, *id.* at 63–64, 68, 71–72. One person—Mr. Gilmore's partner— spoke more generally about the relationship between law enforcement and the black community. *Id.* at 63; *see id.* at 81.

After listening to their statements and considering the entire record, the Court explained its understanding of how the offense unfolded. It observed that Jevric was agitated when he arrived at the scene and remained agitated throughout the duration of the video. *Id.* at 83; *see also id.* at 30–32. Based on Jevric's agitation, especially compared to the body language of other police officers, the Court concurred with the observations of Mr. Gilmore's cousins that "Mr. Jevric lost control of his emotions" and "made an impulsive decision." *Id.* at 80–81. It further elaborated:

16

[I]t was not a rational decision he was making.  He was not weighing the risks that were posed and saying to himself[,] in light of these risks, this is the proper path forward.  And there may be people in those cars who could be at risk or there may be pedestrians and this is what I need to do.  He lost control that day.  I don't think that that means that he is a bad person, but he lost control.

*Id.* at 81.  As illuminated by these remarks, the Court interpreted Jevric's decision to shoot Mr. Gilmore as a momentary loss of control with devastating consequences, not as a racially motivated attack.

To be sure, the Court acknowledged the wider social context in which the offense occurred and referenced the statement of Mr. Gilmore's partner about the general relationship between the black community and law enforcement.  *Id.* at 81–82.  The Court also acknowledged the "understandable perception in the black community and in other communities that life is not valued the way it should be valued."  *Id.*  But in the same breath, the Court clarified that its recognition of the wider social context of the shooting was "not to say that I think that Mr. Jevric was motivated by racial animus in what he did."  *Id.* at 82.

It could not be clearer that alleged racial animus or bias did not factor into the Court's assessment of the sentencing factors.  Rather, the Court focused on Jevric's agitation, both when he arrived at the scene and throughout the entire situation, *id.* at 83, the "aberrational" nature of his conduct in light of his long record of using force appropriately, *id.* at 83–84, the strong likelihood that Jevric simply "lost control," *id.* at 81, whether due to cognitive decline or for some other reason, *id.* at 82–83, the fact that Jevric fired his "gun 10 times" as Mr. Gilmore's car was rolling away, *id.* at 84, and the "horrific" "consequences of what he did," *id.*  Because the Court was not under the impression that the offense was motivated by race, evidence "negating" that impression could not have changed the outcome of the sentencing.

17

**CONCLUSION**

For the foregoing reasons, Defendant's motion to vacate, set aside, or correct his

conviction or sentence, Dkt. 67, is hereby **DENIED**.

    **SO ORDERED**.

                 /s/ Randolph D. Moss
                 RANDOLPH D. MOSS
                 United States District Judge


Date:  June 11, 2026